STATE of Wisconsin, Plaintiff-Respondent,

v.

David W. OAKLEY, Defendant-Appellant-Petitioner.†

Supreme Court

*No. 99–3328–CR. Oral argument May 1, 2001.—Decided July 10, 2001.*

2001 WI 103

(Also reported in 629 N.W.2d 200.)

†Motion for Reconsideration denied 11-23-01.

For the defendant-appellant-petitioner there were briefs by *Timothy T. Kay* and *Kay & Kay Law Firm*, Brookfield, and oral argument by *Timothy T. Kay*.

For the plaintiff-respondent the cause was argued by *Thomas J. Balistreri*, assistant attorney general, with whom on the brief was *James E. Doyle*, attorney general.

¶ 1. JON P. WILCOX, J. This case presents two issues.[1] First, we must decide whether as a condition of

---

[1] Oakley initially argued a third issue on appeal to this court: whether the trial court erred in finding that transferring him to an out-of-state prison did not present a new factor to merit resentencing. However, in his reply brief, Oakley acknowledges that he has since been returned to prison in Wisconsin. Accordingly, that issue is now moot. *See State ex rel. Hawkins v. DHSS*, 92 Wis. 2d 420, 421, 284 N.W.2d 680 (1979)

probation, a father of nine children, who has intentionally refused to pay child support, can be required to avoid having another child, unless he shows that he can support that child and his current children. We conclude that in light of Oakley's ongoing victimization of his nine children and extraordinarily troubling record manifesting his disregard for the law, this anomalous condition—imposed on a convicted felon facing the far more restrictive and punitive sanction of prison—is not overly broad and is reasonably related to Oakley's rehabilitation. Simply put, because Oakley was convicted of intentionally refusing to pay child support—a felony in Wisconsin—and could have been imprisoned for six years, which would have eliminated his right to procreate altogether during those six years, this probation condition, which infringes on his right to procreate during his term of probation, is not invalid under these facts. Accordingly, we hold that the circuit court did not erroneously exercise its discretion.

¶ 2. Second, we must decide whether an individual waives his or her claim of error that the State was impermissibly allowed to withdraw from an earlier plea agreement by entering into a subsequent plea agreement. When a defendant pleads no contest, he or she waives all defenses based on a denial of due process because the prosecutor breached an earlier plea agreement. Thus, we find that there was waiver here.

I

¶ 3. David Oakley (Oakley), the petitioner, was initially charged with intentionally refusing to pay child support for his nine children he has fathered with

(determining that appeal was moot where convicted individual had been released from incarceration).

452

four different women. The State subsequently charged Oakley with seven counts of intentionally refusing to provide child support as a repeat offender. His repeat offender status stemmed from intimidating two witnesses in a child abuse case—where one of the victims was his own child. *State v. Oakley*, 226 Wis. 2d 437, 441, 594 N.W.2d 827 (Ct. App. 1999), *rev'd on other grounds, State v. Oakley*, 2000 WI 37, 234 Wis. 2d 528, 609 N.W.2d 786. Oakley and the State entered into a plea agreement on the seven counts, but the State, after learning that Oakley's probation in Sheboygan County was in the process of being revoked, moved at sentencing to withdraw the plea agreement. The circuit court for Manitowoc County, Fred H. Hazlewood, Judge, granted the State's motion.

¶ 4. Oakley then entered into another plea agreement in which he agreed to enter a no contest plea to three counts of intentionally refusing to support his children and have the other four counts read-in for sentencing. He further agreed that he would not complain on appeal about the State's withdrawal from the first plea agreement. The State, in turn, agreed that in exchange for his no contest plea, it would cap its sentencing recommendation to a total of six years on all counts. Oakley, however, was free to argue for a different sentence.

¶ 5. At sentencing, Judge Hazlewood informed Oakley that by pleading no contest, he waived his right to have the State prove that he was legally obligated to support his children and that he intentionally refused to do so for at least 120 days contrary to Wis. Stat. § 948.22(2) (1997–98).[2] The State noted that during the relevant time period, Oakley had paid no child sup-

---

[2] All subsequent references to the Wisconsin Statutes will be to the 1997–98 version unless otherwise indicated.

port and that there were arrears in excess of $25,000. Highlighting Oakley's consistent and willful disregard for the law and his obligations to his children, the State argued that Oakley should be sentenced to six years in prison consecutive to his three-year sentence in Sheboygan County.[3] Oakley, in turn, asked for the opportunity to maintain full-time employment, provide for his children, and make serious payment towards his arrears.

¶ 6. After taking into account Oakley's ability to work and his consistent disregard of the law and his obligations to his children, Judge Hazlewood observed that "if Mr. Oakley had paid something, had made an earnest effort to pay anything within his remote ability to pay, we wouldn't be sitting here," nor would the State argue for six years in prison. But Judge Hazlewood also recognized that "if Mr. Oakley goes to prison, he's not going to be in a position to pay any meaningful support for these children." Therefore, even though Judge Hazlewood acknowledged that Oakley's "defaults, are obvious, consistent, and inexcusable," he decided against sentencing Oakley to six years in prison consecutive to his three-year sentence in Sheboygan County, as the State had advocated. Instead, Judge Hazlewood sentenced Oakley to three years in prison on the first count, imposed and stayed an eight-year term on the two other counts, and imposed a five-year term of probation consecutive to his incarceration. Judge Hazlewood then imposed the condition at issue here: while on probation, Oakley cannot have any more children unless he demonstrates that he had the ability to support them and that he is supporting the children

---

[3] Oakley's probation on his felony witness intimidation conviction in Sheboygan County was revoked for violating a condition of his probation.

he already had. After sentencing, Oakley filed for post-conviction relief contesting this condition and the State's withdrawal from the first plea agreement.

¶ 7. In a per curiam opinion, the court of appeals affirmed the circuit court's rulings on both issues. *State v. Oakley*, No. 99–3328–CR, unpublished slip op. at ¶ 1 (Wis. Ct. App. Sept. 13, 2000). The court of appeals found that the condition placed on Oakley was not overly broad and that it was reasonable. The court also found that Oakley's decision to enter into the subsequent plea agreement "waived his right to challenge matters relating to the first plea agreement." *Id.* at ¶ 5. Oakley petitioned this court for review, which we granted.

## II

¶ 8. Oakley challenges the constitutionality of a condition of his probation for refusing to pay child support. The constitutionality of a condition of probation raises a question of law, which this court reviews independently without deference to the decisions of the circuit court or the court of appeals. *See State v. Griffin*, 131 Wis. 2d 41, 49, 388 N.W.2d 535 (1986); *Edwards v. State*, 74 Wis. 2d 79, 85, 246 N.W.2d 109 (1976).

¶ 9. Refusal to pay child support by so-called "deadbeat parents" has fostered a crisis with devastating implications for our children.[4] Of those single parent households with established child support awards or orders, approximately one-third did not receive any payment while another one-third received

---

[4] In order to address the epidemic of noncustodial parents refusing to pay child support, Congress passed the Deadbeat Parents Punishment Act of 1998, Pub. L. 105–187, amending 18 U.S.C. § 228.

only partial payment.[5] For example, in 1997, out of $26,400,000,000 awarded by a court order to custodial mothers, only $15,800,000,000 was actually paid, amounting to a deficit of $10,600,000,000.[6] These figures represent only a portion of the child support obligations that could be collected if every custodial parent had a support order established.[7] Single mothers disproportionately bear the burden of nonpayment as the custodial parent.[8] On top of the stress of being a single parent, the nonpayment of child support frequently presses single mothers below the poverty line.[9] In fact, 32.1% of custodial mothers were below the poverty line in 1997, in comparison to only 10.7% of custodial fathers.[10] Indeed, the payment of child support is widely regarded as an indispensable step in assisting single mothers to scale out of poverty, espe-

[5] Timothy Grail, *Child Support for Custodial Mothers and Fathers*, Current Population Reports, United States Census Bureau, 4 (October 2000).

[6] United States Census Bureau, U.S. Dep't of Commerce, Current Population Survey, *Child Support 1997*, Table 1 (1998).

[7] Karen Rothschild Cavanaugh & Daniel Pollack, *Child Support Obligations of Incarcerated Parents*, 7 Cornell J.L. & Pub. Pol'y 531 (1998).

[8] *See Child Support 1997*, Table 1; Drew D. Hansen, *The American Invention of Child Support: Dependency and Punishment in Early American Child Support Law*, 108 Yale L.J. 1123, 1125–26 (1999) (observing that historically, courts, spurred by increasing concern over the dependency of single mothers, created child support obligations); Daniel R. Meyer, "Fathers and the Child Support System" 88, in *Child Support: The Next Frontier*, (J. Thomas Oldham & Marygold S. Melli eds., 2000).

[9] Marsha Garrison, "The Goals and Limits of Child Support Policy" 16 in *Child Support: The Next Frontier*, (J. Thomas Oldham & Marygold S. Melli eds., 2000).

[10] Grail, *supra*, 2.

cially when their welfare benefits have been terminated due to new time limits.[11]

¶ 10. The effects of the nonpayment of child support on our children are particularly troubling. In addition to engendering long-term consequences such as poor health, behavioral problems, delinquency and low educational attainment, inadequate child support is a direct contributor to childhood poverty.[12] And childhood poverty is all too pervasive in our society. Over 12 million or about one out of every six children in our country lives in poverty.[13] In Wisconsin, poverty strikes approximately 200,000 of our children with 437,000 at or below 200% of the poverty level in 1999.[14] Although payment of child support alone may not end childhood poverty, it could reduce current levels and raise childhood standards of living.[15] Child support—when paid—on average amounts to over one-quarter of a poor child's family income.[16] There is little doubt that the payment of child support benefits pov-

---

[11] Daniel R. Meyer & Maria Cancian, *Child Support and Economic Well-Being Following an Exit from AFDC* (1996) (report submitted to the Wisconsin Department of Workforce Development); Elaine Sorensen & Chava Zibman, *To What Extent do Children Benefit from Child Support? New Information from the National Survey of America's Families, 1997*, Focus, Spring 2000, at 36–37.

[12] Garrison, *supra*, 16.

[13] Joseph Dalaker & Bernadette D. Proctor, *Poverty in the United States*, vi Current Population Reports, United States Census Bureau (2000).

[14] Children's Defense Fund, *Child Poverty by State–1997* (2000); U.S. Census Bureau, *Low Income Uninsured Children by State: 1997, 1998, and 1999*, Current Population Survey (1998–2000).

[15] Garrison, *supra*, 22–26.

[16] Sorensen, *supra*, 36.

erty-stricken children the most.[17] Enforcing child support orders thus has surfaced as a major policy directive in our society.

¶ 11. In view of the suffering children must endure when their noncustodial parent intentionally refuses to pay child support, it is not surprising that the legislature has attached severe sanctions to this crime.[18] Wis. Stat. § 948.22(2). This statute makes it a Class E felony for any person "who intentionally fails for 120 or more consecutive days to provide spousal, grandchild or child support which the person knows or reasonably should know the person is legally obligated to provide. . . ."[19] A Class E felony is punishable with "a

---

[17] Sorensen, *supra*, 37.

[18] Justice Bradley seems to disagree with the public policy that intentionally refusing to pay child support should warrant punishment because this crime "imbues a fundamental liberty interest [the right to procreate] with a sliding scale of wealth." Justice Bradley's dissent at ¶ 58, joined by Chief Justice Abrahamson and Justice Sykes. However, in opting to score rhetorical points rather than providing a clear and judicious explication of the law, Justice Bradley ignores the central element in this crime: it punishes only *intentional* refusal to pay child support. If an individual is *unable* to pay child support, but did not intentionally refuse to do so, this element of the offense would not be met. This is not a strict liability offense. While Justice Bradley may believe that it is unfair for the law to require that "deadbeat parents" not intentionally refuse to pay child support, that is a policy decision for the legislature, not this court.

[19] In Wisconsin, a circuit court typically orders support payments as a percentage of a parent's income, not as an invariable dollar amount. Wis. Admin. Code §§ DWD 40.03 & 40.04 (2001). This means that it is within any parent's ability—regardless of his or her actual income or number of children he or she has—to comply with a child support order.

458

fine not to exceed $10,000 or imprisonment not to exceed 2 years, or both." Wis. Stat. § 939.50(3)(e). The legislature has amended this statute so that intentionally refusing to pay child support is now punishable by up to five years in prison. *See* Wis. Stat. § 939.50(3)(e)(1999–2000).

¶ 12. But Wisconsin law is not so rigid as to mandate the severe sanction of incarceration as the only means of addressing a violation of § 948.22(2). In sentencing, a Wisconsin judge can take into account a broad array of factors, including the gravity of the offense and need for protection of the public and potential victims. *State v. Guzman*, 166 Wis. 2d 577, 592, 480 N.W.2d 446 (1992). Other factors—concerning the convicted individual—that a judge can consider include:

> the past record of criminal offenses; any history of undesirable behavior patterns; the defendant's personality, character and social traits; the results of a presentence investigation; the vicious or aggravated nature of the crime; the degree of defendant's culpability; the defendant's demeanor at trial; the defendant's age, educational background and employment record; the defendant's remorse, repentance and cooperativeness; the defendant's need for close rehabilitative control; the rights of public; and the length of pretrial detention.

*Id.* After considering all these factors, a judge may decide to forgo the severe punitive sanction of incarceration and address the violation with the less restrictive alternative of probation coupled with specific conditions. Wisconsin Stat. § 973.09(1)(a) provides:

> [I]f a person is convicted of a crime, the court, by order, may withhold sentence or impose sentence

> under s. 973.15 and stay its execution, and in either case place the person on probation to the department for a stated period, stating in the order the reasons therefor. The court may impose any conditions which appear to be reasonable and appropriate.

The statute, then, grants a circuit court judge broad discretion in fashioning a convicted individual's conditions of probation. As we have previously observed, "[t]he theory of the probation statute is to rehabilitate the defendant and protect society without placing the defendant in prison. To accomplish this theory, the circuit court is empowered by Wis. Stat. § 973.09(1)(a) to fashion the terms of probation to meet the rehabilitative needs of the defendant." *State v. Gray*, 225 Wis. 2d 39, 68, 590 N.W.2d 918 (1999). While rehabilitation is the goal of probation, judges must also concern themselves with the imperative of protecting society and potential victims. On this score, we have explained:

> The theory of probation contemplates that a person convicted of a crime who is responsive to supervision and guidance may be rehabilitated without placing him in prison. This involves a prediction by the sentencing court society will not be endangered by the convicted person not being incarcerated. This is risk that the legislature has empowered the courts to take in the exercise of their discretion. . . .
> If the convicted criminal is thus to escape the more severe punishment of imprisonment for his wrongdoing, society and the potential victims of his anti-social tendencies must be protected.

*State v. Evans*, 77 Wis. 2d 225, 231, 252 N.W.2d 664 (1977). Thus, when a judge allows a convicted individual to escape a prison sentence and enjoy the relative

freedom of probation, he or she must take reasonable judicial measures to protect society and potential victims from future wrongdoing. To that end—along with the goal of rehabilitation—the legislature has seen fit to grant circuit court judges broad discretion in setting the terms of probation.

¶ 13. Nevertheless, this broad discretion given to trial judges has come under fire by various commentators, especially where trial judges elsewhere in the country have imposed probation conditions that reflect their own idiosyncrasies rather than serve a rehabilitative purpose.[20] We agree that judges should not abuse their discretion by imposing probation conditions on convicted individuals that reflect only their own idiosyncrasies. Instead, they should use their discretion in setting probation conditions to further the objective of rehabilitation and protect society and potential victims from future wrongdoing. And because we recognize that convicted felons may have trouble conforming their future conduct to the law, we uphold the power of a judge to tailor individualized probation conditions per Wis. Stat. § 973.09(1)(a).

¶ 14. In the present case, the record indicates that Judge Hazlewood was familiar with Oakley's

[20] *See, e.g.*, Andrew Horwitz, *Coercion, Pop-Psychology and Judicial Moralizing: Some Proposals for Curbing Judicial Abuse of Probation Conditions*, 57 Wash. & Lee L. Rev. 75 (2000) (advocating greater appellate court oversight of the trial judge's discretion to experiment with new probation conditions); Jon A. Brilliant, *The Modern Day Scarlet Letter: A Critical Analysis of Modern Probation Conditions*, 1989 Duke L.J. 1357, 1384 (1989) (lauding "innovative judges" for imposing creative sentences but urging appellate review when "their creativity strays too far.").

abysmal history prior to sentencing. The record reveals that Judge Hazlewood knew that Oakley had a number of support orders entered for his nine children, but he nevertheless continually refused to support them. He was aware that Oakley's probation for intimidating two witnesses in a child abuse case—where one of the witnesses was his own child and the victim—was in the process of being revoked. Judge Hazlewood was also apprised that Oakley had promised in the past to support his children, but those promises had failed to translate into the needed support. Moreover, he knew that Oakley had been employed and had no impediment preventing him from working. As the court of appeals observed in the witness intimidation case against Oakley, "[t]he refusal to pay the fines and the victim intimidation both show Oakley's cavalier attitude toward the justice system. . . .Oakley needs to be rehabilitated from his perception that one may flout valid court orders and the judicial process with impunity and suffer no real consequence." *Oakley*, 226 Wis. 2d at 441. Given his knowledge of Oakley's past conduct, Judge Hazlewood was prepared to fashion a sentence that would address Oakley's ongoing refusal to face his obligations to his nine children as required by law.

¶ 15. In doing so, Judge Hazlewood asserted that some prison time coupled with conditional probation might convince Oakley to stop victimizing his children. With probation, Judge Hazlewood sought to rehabilitate Oakley while protecting society and potential victims—Oakley's own children—from future wrongdoing.[21] The conditions were designed to assist Oakley

---

[21] Justice Bradley misrepresents the record by stating that Judge Hazlewood "acknowledged that Oakley [would] be unable to meet this condition." Justice Bradley's dissent at ¶ 43. How-

in conforming his conduct to the law. In Wisconsin, as expressed in Wis. Stat. § 948.22(2), we have condemned unequivocally intentional refusal to pay child support and allow for the severe sanction of prison to be imposed on offenders. Here, the judge fashioned a condition that was tailored to that particular crime, but avoided the more severe punitive alternative of the full statutory prison term through the rehabilitative tool of probation. At the same time, Judge Hazlewood sought to protect the victims of Oakley's crimes—Oakley's nine children.

¶ 16. But Oakley argues that the condition imposed by Judge Hazlewood violates his constitutional right to procreate.[22] This court, in accord with

ever, a careful reading of the record uncovers no such acknowledgement by Judge Hazlewood. Instead, the record reveals Judge Hazlewood's recognition that Oakley might not be able to earn large amounts of money in the future, but that he would be expected to provide support based on his ability to earn and pay. But Judge Hazlewood had no doubt that Oakley could avoid committing the crimes for which he was convicted: *intentionally* refusing to support his children, which is what the probation condition is directed at preventing. As previously noted, Judge Hazlewood commented on the intent element of this crime by stating that "if Mr. Oakley had paid something, had made an earnest effort to pay anything within his remote ability to pay, we wouldn't be sitting here." While Justice Bradley seems to be attempting to twist Judge Hazlewood's statement regarding Oakley's situation into something with malevolent overtones, the record does not support her effort.

[22] Justice Bradley begins here defending what she apparently perceives is Oakley's absolute right to procreate children while refusing to support them. Justice Bradley's dissent at ¶ 40. In the process, she diminishes the basic needs of children—the true victims when a parent intentionally refuses to pay child support—contrary to Wis. Stat. § 948.22(2), which is

the United States Supreme Court, has previously recognized the fundamental liberty interest of a citizen to choose whether or not to procreate. *Eberhardy v. Circuit Court for Wood County*, 102 Wis. 2d 539, 561, 307 N.W.2d 881 (1981); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942) (recognizing the right to procreate as "one of the basic civil rights of man"). Accordingly, Oakley argues that the condition here warrants strict scrutiny.[23] That is, it must be

the crime Oakley was convicted of committing. Unlike Justice Bradley, we do not believe that Oakley has an absolute right to refuse to support his nine current children or any future children.

[23] While the condition here survives strict scrutiny, *see* majority op. at ¶ 18, we note that probation conditions—like prison regulations—are not subject to strict scrutiny analysis, contrary to the unwarranted assumptions in the arguments of both Oakley and Justice Bradley. Justice Bradley's dissent at ¶ 45. If probation conditions were subject to strict scrutiny, it would necessarily follow that the more severe punitive sanction of incarceration, which deprives an individual of the right to be free from physical restraint and infringes upon various other fundamental rights, likewise would be subjected to strict scrutiny analysis. *See* Sherry F. Colb, *Freedom from Incarceration: Why is This Right Different from All Other Rights?* 69 N.Y.U. L. Rev. 781 (1994) (advocating strict scrutiny for every time an individual is incarcerated because fundamental rights are implicated including total deprivation of the right to be free from physical restraint during the period of confinement). Thus, Oakley and Justice Bradley's position is either illogical in that it requires strict scrutiny for conditions of probation that infringe upon fundamental rights but not for the more restrictive alternative of incarceration, or it is unworkable in that it demands the State meet the heavy burden of strict scrutiny whenever it is confronted with someone who has violated the law. This would be in addition to the State's burden to demonstrate a defendant's guilt beyond a reasonable doubt. We reject the

narrowly tailored to serve a compelling state interest. *See Zablocki v. Redhail*, 434 U.S. 374, 388 (1978). Although Oakley concedes, as he must, that the State's interest in requiring parents to support their children is compelling, he argues that the means employed here is not narrowly tailored to serve that compelling interest because Oakley's "right to procreate is not restricted but in fact eliminated." According to Oakley, his right to procreate is eliminated because he "probably never will have the ability to support" his children. Therefore, if he exercises his fundamental right to procreate while on probation, his probation will be revoked and he will face the stayed term of eight years in prison.

unsupported position of Oakley and Justice Bradley that strict scrutiny applies in this context.

In contrast, Justice Sykes identifies the correct test. Justice Sykes' dissent at ¶ 68, joined by Chief Justice Abrahamson and Justice Bradley. However, Justice Sykes missteps by failing to apply that test and, in relying on *Zablocki v. Redhail*, 434 U.S. 374, 376 (1978), she utilizes strict scrutiny, like Justice Bradley. Justice Sykes' dissent at ¶¶ 72–73. Although it may be that the facts of *Zablocki* are interesting because it was a Wisconsin case, its holding is not implicated here for the simple reason that the test in *Zablocki* was "[w]hen a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests," a.k.a., strict scrutiny. 434 U.S. at 388. Therefore, Justice Sykes' dissent is legally inconsistent in that she identifies the correct test (to avoid the precedential pitfalls that Justice Bradley would make as highlighted above), but she nevertheless applies the incorrect test, strict scrutiny, to Oakley's case.

¶ 17. While Oakley's argument might well carry the day if he had not intentionally refused to pay child support, it is well-established that convicted individuals do not enjoy the same degree of liberty as citizens who have not violated the law. *See Evans*, 77 Wis. 2d at 230 (asserting that "liberty enjoyed by a probationer is, under any view, a conditional liberty" and that probationer's "position is not that of a non-convicted citizen"); *Von Arx v. Schwarz*, 185 Wis. 2d 645, 658, 517 N.W.2d 540 (Ct. App. 1994) (observing that felon on probation does not enjoy the same constitutional guarantees as the citizenry). We emphatically reject the novel idea that Oakley, who was convicted of intentionally failing to pay child support, has an absolute right to refuse to support his current nine children and any future children that he procreates, thereby adding more child victims to the list. In an analogous case, Oregon upheld a similar probation condition to protect child victims from their father's abusive behavior in *State v. Kline*, 963 P.2d 697, 699 (Or. Ct. App. 1998).[24]

---

[24] Justice Bradley attempts to minimize the force of *State v. Kline*, 963 P.2d 697 (Or. Ct. App. 1998) as "a single appellate court case from the state of Oregon." *See* Justice Bradley's dissent at ¶ 61 n.3. We agree with Justice Bradley's dissent insofar as it implies that parole conditions infrequently face appellate review. While it may be that criminal defendants, facing the more punitive alternative of incarceration, are generally unwilling to appeal conditions of their probation, this lack of mettle should not be taken as justification for overturning any probation condition that happens to reach an appellate court. *See* Horwitz, *supra*, 81–84 (discussing the reluctance of probationer's, "who feel with good cause," that appealing a condition of probation may result in the imposition of incarceration if the condition is overturned). Furthermore, as we previously observed, the particular condition at issue here is only appropri-

In *Kline*, the defendant physically and emotionally abused his wife and children, especially when high on methamphetamine, which caused him to become angry and hostile. *Id.* at 698. Until his parental rights to his son were terminated, he abused him regularly, eventually breaking his arm. *Id.* Subsequently, he and his wife had a baby girl. *Id.* Undeterred, the defendant spiral fractured his two-and-a-half month old baby girl's leg and bruised her head and chest, causing her to scream uncontrollably. *Id.* He admitted that " 'I caused the bruises on the baby because I don't know my own strength' " and explained his conduct with the observation that " 'babies are so hard to understand. They are so frustrating.' " *Id.* at 699. The defendant was convicted of criminal mistreatment and as a condition of his probation he was required to successfully complete drug and anger management program and obtain prior written approval of the court before fathering any future child. *Id.* at 699. The defendant contested the condition as violating his fundamental right to procreate and asserted that strict scrutiny applied.

¶ 18. The court rejected the defendant's argument that strict scrutiny applied to the probation condition at issue. Securing the rights of his child victims, the court wrote that "[t]he condition provides potential victims with protection from future injury and interferes with defendant's fundamental rights to a permissible degree." *Id.* The court acknowledged that

---

ate in the most egregious circumstances. We decline to overturn a probation condition that is reasonably related to a defendant's rehabilitation because it is only utilized when the defendant's conduct is outrageous and therefore even less likely to reach an appellate court. Thus, while the condition here is extreme and is only acceptable where a defendant's conduct is truly shocking, it is not unprecedented.

the trial court—like the circuit court in the present case—"did not impose a total ban on defendant's reproductive rights." *Id.* The *Kline* court further noted that the trial court "expressed its concern for the safety of any children defendant might conceive in the future in the light of defendant's potential for violence associated with his anger and drug abuse problems." *Id.* Similarly, we believe that in light of Oakley's troubling record of child witness intimidation and intentional refusal to pay child support, denying his nine children assistance for their basic needs, the condition here will provide his child victims and any future child victims with some measure of protection from any of Oakley's future acts that may violate the law.

¶ 19. Furthermore, Oakley fails to note that incarceration, by its very nature, deprives a convicted individual of the fundamental right to be free from physical restraint, which in turn encompasses and restricts other fundamental rights, such as the right to procreate.[25] *See Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (acknowledging that liberty defined by the Four-

---

[25] If Oakley were incarcerated, he would be unable to exercise his constitutional right to procreate. *See Hernandez v. Coughlin*, 18 F.3d 133, 137 (2d Cir. 1994) (observing that "[t]he Constitution. . .does not create any protected guarantee to conjugal visitation privileges while incarcerated"); *Goodwin v. Turner*, 908 F.2d 1395, 1398 (8th Cir. 1990) (asserting that whether restriction of prisoner's right to procreate is valid is determined by whether it "is reasonably related to achieving its legitimate penological objective"); *Goodwin v. Turner*, 702 F.Supp. 1452, 1454 (W.D. Missouri 1988) (holding that "many aspects of marriage that make it a basic civil right, such as cohabitation, sexual intercourse, and the bearing and rearing of children, are superseded by the fact of confinement").

teenth Amendment denotes more than just freedom from bodily restraint); *State ex rel. Anderson-El v. Cooke*, 2000 WI 40, ¶ 24, 234 Wis. 2d 626, 610 N.W.2d 821 (noting that a prisoner's rights and privileges are diminished compared to other citizens, although a prisoner must still be afforded certain constitutional protections). Therefore, given that a convicted felon does not stand in the same position as someone who has not been convicted of a crime[26] , we have previously stated that "conditions of probation may impinge upon constitutional rights as long as they are not overly broad and are reasonably related to the person's rehabilitation." *Edwards v. State*, 74 Wis. 2d 79, 84–85, 246 N.W.2d 109 (1976).[27] In *State v. Krebs*, 212 Wis. 2d 127,

---

[26] For example, convicted felons can be deprived of their constitutional right to vote even after serving their sentence. *See Richardson v. Ramirez*, 418 U.S. 24, 56 (1974) (convicted felons can be deprived of their right to vote after serving their sentences); Wis. Const. art. III, § 2(4)(a).

[27] Justice Bradley disregards this reasonability standard and asserts, without any authority, that the probation condition here requires strict scrutiny. Justice Bradley's dissent at ¶ 45. Nevertheless, there is abundant case law that a probation condition infringing upon a constitutional right is analyzed under the above well-established reasonability standard. Below is a sampling of the cases employing this well-established reasonability standard in analyzing a probation that infringes upon a convicted individual's fundamental right:

1st Amendment—Freedom of Speech

*State v. Miller*, 175 Wis. 2d 204, 210, 499 N.W.2d 215 (Ct. App. 1993) (holding that probation condition prohibiting probationer from telephoning any woman not a member of his family without prior permission from his probation officer was a reasonable and not overly broad infringement of probationer's first amendment rights); *United States v. Turner*, 44 F.3d 900, 903 (10th Cir. 1995) (asserting that probation condition requiring

defendant convicted of obstructing federal court order to refrain from harassing, intimidating, or picketing in front of any abortion family planning services center permissible restriction of First Amendment right of free speech because restriction reasonably related to goal of prohibiting further illegal conduct); *United States v. Clark*, 918 F.2d 843, 847–48 (9th Cir. 1990) (ruling that probation condition that police officers convicted of perjury issue public apology is reasonable because recognition of guilt related to rehabilitation) *rev'd on other grounds* sub nom. *United States v. Keys*, 95 F.3d 874 (9th Cir. 1996); *United States v. Terrigno*, 838 F.2d 371, 374 (9th Cir. 1988) (upholding probation condition that defendant not speak for money about her crime, even though it infringed on her right to free speech, because it was reasonably related to her rehabilitation); *United States v. Beros*, 833 F.2d 455, 467 (3d Cir. 1987)(upholding probation condition that defendant refrain from representing union as elected official or paid employee because significant imposition upon defendant's First Amendment rights "reasonable in light of the offense").

1st Amendment—Freedom of Association

*Turner*, 44 F.3d at 903 (ruling that probation condition prohibiting defendant from harassing, intimidating or picketing in front of any abortion family planning services center permissible restriction of First Amendment freedom of association when convicted of obstructing federal court order and restriction reasonably related to goal of prohibiting further illegal conduct); *United States v. Hughes*, 964 F.2d 536, 542–43 (6th Cir. 1992) (upholding as reasonable a probation condition that prohibited the defendant from representing or serving as officer in Communications Workers of America constitutionally permissible when defendant convicted of violations of IRS Code and federal false statements statutes); *United States v. Bolinger*, 940 F.2d 478, 480 (9th Cir. 1991) (upholding probation condition that prevented defendant from participating in any motorcycle club activities as reasonably related to the defendant's rehabili-

uphold a condition of probation that required a defendant who sexually assaulted his own daughter to

tation where he was convicted of being a felon in possession of a weapon); *Malone v. United States*, 502 F.2d 554, 556–57 (9th Cir. 1974) (allowing probation condition that prohibited defendant from associating with Irish cultural, political, or social organizations as reasonably related to the goals of probation—thereby constitutionally permissible—when defendant, Irish Republican Army sympathizer, convicted of gun running).

1st Amendment—Freedom of Religion and 2nd Amendment—Right to Bear Arms

*United States v. Juvenile No. 1*, 38 F.3d 470, 473 (9th Cir. 1994) (holding that probation condition prohibiting Native-American juveniles who pleaded guilty to simple assault from possessing firearms until age 21 is constitutionally permissible even though hunting with firearm important religious ritual to juveniles because probation condition reasonably served statutory goals of punishment, deterrence and public protection).

2nd Amendment—Right to Bear Arms

*Rice v. United States*, 850 F.Supp. 306 (E.D. Pa. 1994) (ruling that Congress could restrict a person's right to possess a firearm, after a conviction for possession of firearms by a convicted felon, even when a pardon was granted with regard to the underlying felony and citing *Lewis v. United States*, 445 U.S. 55 (1980)), *rev'd on other grounds Rice v. United States*, 68 F.3d 702 (3d 1995).

4th Amendment—Right to be Free from Unreasonable Searches and Seizures

*Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (upholding Wisconsin law allowing a search of a probationer's home as long as the probation officer has "reasonable grounds" to believe the presence of contraband and reiterating its *Morrissey v. Brewer*, 408 U.S. 471 (1972) language that "probationers. . .do not enjoy 'the absolute liberty to which every citizen is entitled, but only. . .conditional liberty properly dependent on observance of special restrictions.' ").

obtain his probation agent's approval before entering into an intimate or sexual relationship. The court

Right to Engage in Political Activity or Run for Political Office

*U.S. v. Peete*, 919 F.2d 1168, 1181 (6th Cir. 1990) (holding that probation condition on elected official convicted of attempting to extort bribe lawfully prevented that official from seeking or serving in elected public office during period of probation were valid because it would assist in the probationer's rehabilitation and protect the public); *United States v. Tonry*, 605 F.2d 144, 148 (5th Cir. 1979) (ruling that probationer convicted of violating federal election laws could be lawfully prohibited from running for political office or engaging in political activities during period of probation because the condition was reasonably related to the probationer's rehabilitation).

Freedom of Movement

*United States v. Lowe*, 654 F.2d 562, 568 (9th Cir. 1981) (upholding probation condition that prohibited defendants convicted of entering a submarine base illegally from coming within 250 feet of the base was reasonable "[g]iven the alternatives of imprisonment or some other greater restriction" upon the defendant's rights of movement, association, and speech); *State v. Cooper*, 282 S.E.2d 436, 439 (N.C. 1981) (ruling that probation condition prohibiting defendant from operating a motor vehicle on the public streets and highways between 12:01 a.m. and 5:30 a.m. was reasonably related to defendant's rehabilitation where defendant pled guilty to fourteen crimes involving the use of stolen credit cards).

Right to Procreate

*State v. Krebs*, 212 Wis. 2d 127, 131–32, 568 N.W.2d 26 (Ct. App. 1997) (upholding probation condition that required defendant convicted of sexually assaulting his daughter to obtain permission from his probation agent prior to engaging in sexual relationship was reasonable and not overly broad); *State v. Kline*, 963 P.2d 697, 699 (Or. Ct. App. 1998) (rejecting strict scrutiny of probation condition that required defendant to complete drug counseling and anger management treatment before fathering any future children).

found that although the condition infringed upon a constitutional right, it was reasonable and not overly broad. *Id.* at 131.

■

¶ 20. Applying the relevant standard here, we find that the condition is not overly broad because it does not eliminate Oakley's ability to exercise his constitutional right to procreate. He can satisfy the condition of probation by making efforts to support his children as required by law. Judge Hazlewood placed no limit on the number of children Oakley could have. Instead, the requirement is that Oakley acknowledge the requirements of the law and support his present and any future children.[28] If Oakley decides to continue his present course of conduct—intentionally refusing to pay child support—he will face eight years in prison regardless of how many children he has. Furthermore, this condition will expire at the end of his

---

Accordingly, in light of the weight of authority indicating that strict scrutiny does not apply when a probation condition infringes upon a fundamental right and the dearth of authority to the contrary, we are convinced that the reasonability standard is the constitutionally valid approach to evaluate a probation condition that infringes upon a fundamental right. To hold otherwise here would elevate the right to procreate—which is undeniably fundamental—above all other fundamental rights, such as free speech, free exercise of religion, and the right to vote. There is no constitutional basis for doing so.

[28] Contrary to the contention in ¶ 48 of Justice Bradley's dissent, we have stated condition at issue accurately. *See* ¶ 6 herein. That Oakley intentionally refused to pay child support is the choice that he made that led to the probation condition. Contrary to Justice Bradley's implication, that is the only choice at issue. It is not the amount of money he makes, but his persistent refusal to pay a cent to his children, despite his ability to do so.

term of probation. He may then decide to have more children, but of course, if he continues to intentionally refuse to support his children, the State could charge him again under § 948.22(2). Rather, because Oakley can satisfy this condition by not intentionally refusing to support his current nine children and any future children as required by the law, we find that the condition is narrowly tailored to serve the State's compelling interest of having parents support their children.[29] It is also narrowly tailored to serve the State's compelling interest in rehabilitating Oakley through probation rather than prison. The alternative to probation with conditions—incarceration for eight years—would have further victimized his children.[30] And it is undoubtedly

---

[29] Justice Bradley correctly notes that there is not a single court that "has allowed the right to have children conditioned upon financial status." Justice Bradley's dissent at ¶ 61. Today's opinion is in accord with that lack of precedent. We uphold Judge Hazlewood's efforts to preserve Oakley's fundamental rights—including his right to procreate—by not incarcerating him. Oakley must only stop committing the crime of intentionally refusing to pay child support in order stay within the conditions of his parole.

[30] The fact that Oakley pled no contest to three counts of Wis. Stat. § 948.22(2) belies the implication in his brief that the State could have utilized other means to serve its compelling interest, such as wage assignment, lien on personal property, or civil contempt. Moreover, Oakley apparently admits that these means would be ineffective by asserting that he "cannot and probably will never have the ability to properly support [his] children." With this statement, Oakley attempts to confuse the financial ability to support his children fully with the intention of making any effort to do so. That is, Oakley violated § 948.22(2) because he intentionally refused to pay any child support, not because he lacked the financial wherewithal to pay any child support. As Judge Hazlewood observed, "if Mr. Oakley

much broader than this conditional impingement on his procreative freedom for it would deprive him of his fundamental right to be free from physical restraint. Simply stated, Judge Hazlewood preserved much of Oakley's liberty by imposing probation with conditions rather than the more punitive option of imprisonment. *See State v. Evans*, 77 Wis. 2d 225, 230, 252 N.W.2d 664 (1977) ("Whether sentence 'is withheld or imposed and stayed, a convicted person's status as a probationer is a matter of grace or privilege and not a right' made possible by the legislature.") (citation omitted).

¶ 21. Moreover, the condition is reasonably related to the goal of rehabilitation. A condition is reasonably related to the goal of rehabilitation if it assists the convicted individual in conforming his or her conduct to the law. *See State v. Miller*, 175 Wis. 2d 204, 210, 499 N.W.2d 215 (Ct. App. 1993) (ruling that condition on probationer convicted of making obscene telephone calls forbidding him to make calls to any woman other than a family member was reasonably related to his rehabilitation); *Edwards*, 74 Wis. 2d at 85 (holding that condition on probationer convicted of three crimes with co-defendants banning her from having any contact with her co-defendants was reasonably related to her rehabilitation). Here, Oakley was convicted of intentionally refusing to support his children. The condition at bar will prevent him from adding victims if he continues to intentionally refuse to support his children. As the State argues, the condition essentially bans Oakley from violating the law again. Future violations of the law would be detrimental to Oakley's rehabilitation, which necessitates preventing him from

had paid something, had made an earnest effort to pay anything within his remote ability to pay, we wouldn't be sitting here."

continuing to disregard its dictates. Accordingly, this condition is reasonably related to his rehabilitation because it will assist Oakley in conforming his conduct to the law.

### III

¶ 22. Having determined that the probation condition is valid, we turn now to the issue of whether Oakley waived his claim of error that the State was impermissibly allowed to withdraw from an earlier plea agreement by entering into a subsequent plea agreement with the State.[31] Whether a defendant has waived his or her claim of error by entering a plea is a question of law which this court reviews de novo. *State v. Lechner*, 217 Wis. 2d 392, 404 n.8, 576 N.W.2d 912 (1998); *State v. Riekkoff*, 122 Wis. 2d 119, 122–25, 332 N.W.2d 744 (1983).

¶ 23. As this court has previously stated, "[i]t is well-established that a plea of no contest, knowingly and understandingly made, constitutes a waiver of non-jurisdictional defects and defenses, including claimed violations of constitutional rights." *Lechner*, 217 Wis. 2d at 404 n.8. Therefore, when a defendant

---

[31] Although Oakley attempts to frame the issue as whether the circuit court erroneously granted the State's motion to withdraw from the original plea agreement, we need not reach that issue because we determine that Oakley waived his right to a claim of error by entering into the subsequent plea agreement. *See Hawkins v. State*, 26 Wis. 2d 443, 449, 132 N.W.2d 545 (1965) (asserting that there was no need to determine the constitutionality of an allegedly illegal search because the defendant waived his right to litigate that issue with his plea of guilty).

pleads no contest, he or she waives all defenses based on a denial of due process because the prosecutor breached an earlier plea agreement. In the instant case, Oakley pled no contest based on his second plea agreement. By doing so, he waived any claim of error that may have occurred when the circuit court permitted the State to withdraw from the first plea agreement.[32] As the court of appeals noted in *State v. Paske*, 121 Wis. 2d 471, 474, 360 N.W.2d 695 (Ct. App. 1984), "[i]t is only when the consensual character of the plea is called into question that the validity of a guilty plea may be impaired." There is no indication here that Oakley's plea was nonconsensual. Accordingly, we find that Oakley, by pleading no contest to the second plea agreement, waived his claim of error that the State was impermissibly allowed to withdraw from the earlier plea agreement.

## IV

¶ 24. In conclusion, based on the atypical facts presented by this case, the Constitution does not shield Oakley—whose record evidences consistent disregard for the law and ongoing victimization of his own nine children—from this unique probation condition where

---

[32] In the second plea agreement, Oakley specifically agreed that he would not appeal the State's withdrawal of the first plea agreement. As the court of appeals observed in *State v. Paske*, 121 Wis. 2d 471, 474, 360 N.W.2d 695 (Ct. App. 1984), "[c]ourts have frequently looked to contract law analogies in determining the rights of defendants allegedly aggrieved in the plea negotiation process." The State bargained for the term that Oakley would not appeal the State's withdrawal of the first plea agreement and Oakley was aware of what he was giving up in agreeing to it.

he has intentionally refused to support his children. Under the exceptional factors presented by this case, the probation condition is not overbroad and it is reasonably related to the probationary goal of rehabilitation. Indeed, this condition is narrowly tailored to serve the compelling state interest of requiring parents to support their children as well as rehabilitating those convicted of crimes. Moreover, this condition will assist Oakley in conforming his conduct to the law and is therefore reasonably related to his rehabilitation. Finally, we find that he waived any claim of error by pleading no contest under the second plea agreement.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 25. WILLIAM A. BABLITCH, J. *(concurring)*. This is a very difficult case, one in which courts are understandably reluctant to get involved.

¶ 26. It is important to note at the outset what this case is all about: It is about a father of nine children who intentionally refuses to support them and was convicted of such.

¶ 27. The two dissents frame the issue in such a way that Oakley's intentional refusal to pay support evolves into an inability to pay support. This case is not at all about an inability to pay support; it is about the intentional refusal to pay support. The difference between an intentional refusal to pay support and an inability to pay support is highly significant and, for me, decisive.

¶ 28. If this case was about the right of the state to limit a person's right to procreate based on his abil-

ity to pay support, the position articulated by Justice Bradley, I would in all likelihood join her dissent.

¶ 29. If this case was about the right of the state to prohibit a person's right to procreate based on his likely unwillingness or inability to support a child financially in the future, Justice Sykes' position, I would in all likelihood join her dissent.

¶ 30. This case is about a man who intentionally refuses to pay support regardless of his ability to do so. That was the dilemma faced by the sentencing court, and that is what led to the court's order.[1]

¶ 31. The dissents conclude that the majority's means of advancing the state's interest is not narrowly tailored to advance the state's interest. The dissents fail to advance any realistic alternative solution to what they concede is a compelling state interest. As long as the defendant continues to intentionally refuse to pay support, the alternatives posed by the dissents will end up with incarceration—which of course accomplishes indirectly what the dissents say the state cannot do directly.

¶ 32. Accordingly, I am unpersuaded by the dissents.

¶ 33. I conclude that the harm to others who cannot protect themselves is so overwhelmingly apparent and egregious here that there is no room for question. Here is a man who has shown himself time and again to be totally and completely irresponsible. He lives only

---

[1] Obviously, Justice Bradley and I differ as to the effect of the circuit court's order. Read in the context of the entire record, I conclude that if Oakley were to show the court a good faith effort to support his children, the order would be amended. *See* majority op. at ¶ 15 and notes 20 and 21. As the record now stands, Oakley was convicted of an intentional refusal to support his children in any manner.

for himself and the moment, with no regard to the consequences of his actions and taking no responsibility for them. He intentionally refuses to pay support and has been convicted of that felony. The harm that he has done to his nine living children by failing to support them is patent and egregious. He has abused at least one of them. Under certain conditions, it is overwhelmingly obvious that any child he fathers in the future is doomed to a future of neglect, abuse, or worse. That as yet unborn child is a victim from the day it is born.

¶ 34. I am not happy with this result, but can discern no other. And the dissents provide none. Accordingly, I join the majority opinion.

¶ 35. I am authorized to state that Justice JON P. WILCOX and Justice N. PATRICK CROOKS join this concurrence.

¶ 36. N. PATRICK CROOKS, J. *(concurring)*. I join both the majority opinion and the concurrence by Justice Bablitch. I write separately, however, to prevent any misunderstanding regarding the appropriate test for the constitutionality of restrictions on the rights of a probationer. The appropriate test is not the strict scrutiny test, as the majority correctly notes. Majority op. at ¶ 16 n.23. The proper test is " 'conditions of probation may impinge upon constitutional rights as long as they are not overly broad and are reasonably related to the person's rehabilitation.' " Majority op. at ¶ 19.

¶ 37. I also wish to stress the fact that Oakley's nine children, rather than Oakley himself, are the real victims in this case. Given his history of refusing to pay child support, such failure may very well mean that

Oakley's nine children will be raised in poverty. *See* majority op. at ¶¶ 5, 6, 9, 10. Even though "[w]e have come to recognize that forces not within the control of the poor contribute to their poverty," the law should do what it can to minimize the effects of poverty on children. *Goldberg v. Kelly*, 397 U.S. 254, 265 (1970). "From its founding the Nation's basic commitment has been to foster the dignity and well-being of all persons within its borders." *Id.* at 264–65.[1]

The usual methods of enforcing child support orders have proved to be totally unsuccessful with Oakley; therefore, extraordinary methods are required.

¶ 38. For the reasons stated herein, I respectfully concur.

¶ 39. I am authorized to state that Justice WILLIAM A. BABLITCH and Justice JON P. WILCOX join this opinion.

¶ 40. ANN WALSH BRADLEY, J. *(dissenting)*. I begin by emphasizing the right that is at issue: the right to have children. The majority acknowledges this right, but certainly does not convey its significance and preeminence. The right to have children is a basic human right and an aspect of the fundamental liberty which the Constitution jealously guards for all Ameri-

---

[1] The dissent's attempt to raise the spectre of a condition of probation potentially "coercive of abortion" intentionally obfuscates the real issue here. *See* dissenting op. of Justice ANN W. BRADLEY, joined by Chief Justice SHIRLEY S. ABRAHAMSON and Justice DIANE S. SYKES at ¶ 62. What is at issue here is Oakley's wanton refusal to pay support for his nine children.

cans. *See Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 536 (1942).

¶ 41. Thus, the stakes are high in this case. The majority's decision allows, for the first time in our state's history, the birth of a child to carry criminal sanctions. Today's decision makes this court the only court in the country to declare constitutional a condition that limits a probationer's right to procreate based on his financial ability to support his children. Ultimately, the majority's decision may affect the rights of every citizen of this state, man or woman, rich or poor.

¶ 42. I wholeheartedly agree with the majority that the governmental interest at stake in this case is of great magnitude. The state has an interest in requiring parents such as Oakley to support their children. As the majority amply demonstrates, the lack of adequate support for children affects not only the lives of individual children, but also has created a widespread societal problem. However, when fundamental rights are at issue, the end does not necessarily justify the means. The majority concludes that the means of effecting the state's interest are sufficiently narrow in light of this governmental interest. I disagree.

¶ 43. The circuit court's order forbidding Oakley from having another child until he first establishes his ability to support all his children is unconstitutional. Even the circuit court judge who imposed the condition acknowledged that Oakley will be unable to meet this condition. The probation condition is not narrowly drawn to serve the governmental interest at stake. Additionally, aside from the constitutional infirmities, such a condition of probation entails practical problems and carries unacceptable collateral consequences.

I

¶ 44. The United States Supreme Court has described the right to have children as a "basic liberty" that is "fundamental to the very existence and survival of the [human] race." *Skinner*, 316 U.S. at 541. The right is embodied in the sphere of personal privacy protected from unjustified governmental intrusion by the Due Process Clause of the Fourteenth Amendment. *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972). This court, in a case involving involuntary sterilization, has emphasized that the right of a citizen to procreate is central to the zone of privacy protected by the Constitution:

> "If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child."

*Eberhardy v. Circuit Court for Wood County*, 102 Wis. 2d 539, 562, 307 N.W.2d 881 (1981) (quoting *Eisenstadt*, 405 U.S. at 453).

¶ 45. Because the right implicated by the condition of probation in this case is one that is central to the concept of fundamental liberty, the state action infringing upon that right is subject to heightened scrutiny. In *Edwards v. State*, 74 Wis. 2d 79, 84–85, 246 N.W.2d 109 (1976), we explained that conditions of probation may impinge upon constitutional rights so long as they are "not overly broad" and are reasonably related to the probationer's rehabilitation. In the non-probation context, any state action infringing upon a fundamental liberty interest can be justified only by a compelling state interest and must be "narrowly drawn" to express only the legitimate state interests at stake. *Carey v.*

*Population Servs. Int'l*, 431 U.S. 678, 688–89 (1977). Because of the heightened importance of the liberty interest at stake, whether one chooses to frame the means-end inquiry in a case involving the right to procreate while on probation as "not overly broad" or as "narrowly drawn," I believe the essence of the inquiry is the same.

¶ 46. At oral argument, the State confessed confusion as to which party bears the burden of proving that this state action satisfies the strictures of due process. I do not share this confusion. Ordinarily, where a state action infringes upon a liberty interest that is deemed fundamental under the Fourteenth Amendment, it is " 'presumptively unconstitutional.' " *Harris v. McRae*, 448 U.S. 297, 312 (1980). The State must justify its action by establishing that it is narrowly drawn in light of the governmental interest at stake. *See Carey*, 431 U.S. at 684–85; *see also Dunn v. Blumstein*, 405 U.S. 330, 342–43 (1972).

¶ 47. It is important to bear in mind exactly what the circuit court order proscribed. The circuit court order forbids Oakley from fathering another child until he can first establish the financial ability to support his children. Oakley is not prohibited from having intercourse, either indiscriminately or irresponsibly. Rather, the condition of probation is not triggered until Oakley's next child is born.

¶ 48. Curiously, the condition the majority is upholding is not the condition that the circuit court imposed. Contrary to the majority's characterization of the condition of probation (compare majority op. ¶ 6 with ¶ 20), the circuit court imposed in its January 13, 1999, Judgment of Conviction and Sentence the following condition:

484

> Defendant is ordered not to have any further children while on probation unless it can be shown to the Court that he is meeting the needs of his other children and can meet the needs of this one.

The majority and both concurrences frame the condition as if it only forbids an intentional refusal to pay support. This is not the case.

¶ 49. While on its face the order leaves room for the slight possibility that Oakley may establish the financial means to support his children, the order is essentially a prohibition on the right to have children. Oakley readily admits that unless he wins the lottery, he will likely never be able to establish that ability. The circuit court understood the impossibility of Oakley satisfying this financial requirement when it imposed the condition. The court explained that "it would always be a struggle to support these children and in truth [Oakley] could not reasonably be expected to fully support them." Stressing the realities of Oakley's situation, the circuit court explained:

> [Y]ou know and I know you're probably never going to make 75 or 100 thousand dollar a year. You're going to struggle to make 25 or 30. And by the time you take care of your taxes and your social security, there isn't a whole lot to go around, and then you've got to ship it out to various children.

¶ 50. In light of the circuit court's recognition of Oakley's inability to meet the condition of probation, the prohibition cannot be considered a narrowly drawn means of advancing the state's interest in ensuring support for Oakley's children.[1]

---

[1] In discussing child support percentage guidelines, the majority continues to ignore that it is the circuit court's conclu-

¶ 51. In a similar context, the United States Supreme Court has explained that a statutory prohibition on the right to marry, a right closely aligned with the right at issue, was not a justifiable means of advancing the state's interest in providing support for children. *Zablocki v. Redhail*, 434 U.S. 374, 388–90 (1978). The *Zablocki* court addressed a Wisconsin statute that prohibited people from marrying until they established that their child support obligations had been met. The Court, in finding the statute unconstitutional, explained that Wisconsin law provided other available means of advancing the state's interest that did not infringe upon the liberty interest at stake:

> [T]he State already has numerous other means for exacting compliance with support obligations, means that are at least as effective as the instant statute's and yet do not impinge upon the right to marry. Under Wisconsin law, whether the children are from a prior marriage or were born out of wedlock, court-determined support obligations may be enforced directly via wage assignments, civil contempt proceedings, and criminal penalties.

*Id.* at 389–90 (footnote omitted).

¶ 52. Rather than juxtapose the means chosen in the instant case with the alternatives suggested in *Zablocki*, the majority compares the infringement of Oakley's reproductive liberty with the loss of liberty he would suffer had the circuit court chosen to imprison him. It is true that if Oakley were imprisoned he would suffer an incidental inability to exercise his procreative rights. However, the fact of the matter is that Oakley has not been imprisoned. He is a probationer and has

sion that Oakley will be unable to support his children that is determinative.

retained a degree of his liberty, including "a significant degree of privacy under the Fourth, Fifth and Fourteenth Amendments." *People v. Pointer*, 199 Cal. Rptr. 357, 363 (Cal. Ct. App. 1984).[2] While the State has chosen not to exercise control over Oakley's body by depriving him of the freedom from restraint, it does not necessarily follow that the State may opt to exercise unlimited control over his right to procreate.

¶ 53. The narrowly drawn means described by the Supreme Court in *Zablocki* still exist today and are appropriate means of advancing the state's interest in a manner that does not impair the fundamental right to procreate. *See, e.g.*, Wis. Stat. § 767.265 (garnishment/wage assignment); § 767.30 (lien on personal property); § 785.03 (civil contempt). These means, as well as other conditions of probation or criminal penalties, are available in the present case.[3]

---

[2] *Cf. Gagnon v. Scarpelli*, 411 U.S. 778, 782 n.4 (1973) (stating that a probationer cannot be denied due process on the premise that probation is an "act of grace").

[3] I do not set forth a list of other available conditions of probation or penalties, because they are too numerous to list. However, as the majority acknowledges, at sentencing Oakley requested an opportunity to maintain full employment, provide for his children, and make serious payments towards his child support arrearages. Given Oakley's ability to work, an alternative approach could have been as follows: sentence Oakley to eight years in prison; stay the sentence and place him on probation; a condition of probation is that he serve a substantial amount of time in jail with work release privileges; after getting work release hours extended, another condition of probation is that he maintain two full-time jobs, working a minimum of 70 hours per week; conditions of probation also include parenting classes and alcohol and drug assessment/counseling if deemed appropriate.

¶ 54. In light of these alternative means of advancing the compelling state interest at issue, the State has failed to justify that the elimination, or at best qualification, of the right to procreate is narrowly drawn, or in the words of *Edwards*, that it is "not overly broad." The State, and the majority, can do little more than "infer" that these "less drastic methods" will be ineffective in the case of David Oakley. Brief of Plaintiff-Respondent at 13; *see also* majority op. at n.27. Such an inference does not a constitutional justification make. In the absence of such a justification, the state action limiting Oakley's right to procreate is unconstitutional.

## II

¶ 55. In addition to the obvious constitutional infirmities of the majority's decision, upholding a term of probation that prohibits a probationer from fathering a child without first establishing the financial wherewithal to support his children carries unacceptable collateral consequences and practical problems.

¶ 56. First, prohibiting a person from having children as a condition of probation has been described as "coercive of abortion." In *People v. Pointer*, 199 Cal. Rptr. 357 (1984), the court concluded that a condition of probation prohibiting a female probationer from becoming pregnant was unconstitutional. It advanced that such a condition fosters state-coerced abortion:

> [I]n the event she became pregnant during the period of probation the surreptitious procuring of an abortion might be the only practical way to avoid

Of course, I am not suggesting that this is what the sentence should have been. I offer it only as an example of one of many alternatives.

going to prison. A condition of probation that might place a defendant in this position, and if so, be coercive of abortion, is in our view improper.

*Id.* at 366; *see also State v. Mosburg*, 768 P.2d 313, 315 (Kan. Ct. App. 1989).

¶ 57. If the tables are turned to the present case where the probationer is a man, a similar risk arises. Because the condition is triggered only upon the birth of a child, the risk of imprisonment creates a strong incentive for a man in Oakley's position to demand from the woman the termination of her pregnancy. It places the woman in an untenable position: have an abortion or be responsible for Oakley going to prison for eight years. Creating an incentive to procure an abortion in order to comply with conditions of probation is a result that I am not prepared to foster.

¶ 58. Second, by allowing the right to procreate to be subjected to financial qualifications, the majority imbues a fundamental liberty interest with a sliding scale of wealth. Men and women in America are free to have children, as many as they desire. They may do so without the means to support the children and may later suffer legal consequences as a result of the inability to provide support. However, the right to have a child has never been rationed on the basis of wealth.

¶ 59. Nevertheless, the majority has essentially authorized a judicially-imposed "credit check" on the right to bear and beget children. Thus begins our descent down the proverbial slippery slope. While the majority describes this case as "anomalous" and comprised of "atypical facts," the cases in which such a principle might be applied are not uncommon. The majority's own statistical data regarding non-payment of support belies its contention that this case is truly exceptional.

489

¶ 60. Third, the condition of probation is unworkable. David Oakley is not restrained, and realistically cannot be stopped, from having intercourse—protected or otherwise. The condition of probation will not be violated until the woman with whom he has sexual relations carries her pregnancy to term. Then, Oakley will be imprisoned, and another child will go unsupported. The Eight Circuit Court of Appeals noted this very problem with such a condition of probation, and concluded that it is unworkable:

> Short of having a probation officer follow [the probationer] twenty-four hours a day, there is no way to prevent [the probationer] from fathering more children. If [the probationer] were to violate this condition of his probation, he may well be returned to prison, leaving him no way to provide for his dependents. This certainly would not serve the district court's goal of "adequately support[ing] and sustain[ing]" [the probationer's] children.

*United States v. Smith*, 972 F.2d 960, 962 (8th Cir. 1992).

## III

¶ 61. In light of the constitutional problems and other dilemmas posed by a condition that limits a probationer's right to father a child without first establishing the financial ability to support his children, it is not surprising that the majority is the sole court in this country to conclude that the condition is constitutional. The majority fails to cite any case law in which a court has allowed the right to have children to

490

be conditioned upon financial status.[4] It does not because it cannot. There is no precedent to cite.

¶ 62. Ultimately, the positions of the majority opinion and concurrences actually undermine the values they seek to promote:

I, too, am concerned about children raised in poverty, as set forth in Justice Crooks' concurrence, but that cannot excuse a condition of probation that has the potential to be "coercive of abortion."[5]

I, too, am troubled by the societal problem caused by "deadbeat" parents as set forth in Justice Bablitch's concurrence, but that problem must be addressed in a workable manner that passes constitutional muster.

I, too, am mindful of the premise that no right is absolute as set forth in the majority opinion, but that premise does not justify making the basic human right to have children subject to financial qualification.

¶ 63. Let there be no question that I agree with the majority that David Oakley's conduct cannot be condoned. It is irresponsible and criminal. However, we must keep in mind what is really at stake in this case. The fundamental right to have children, shared by us all, is damaged by today's decision. Because I will

---

[4] The majority proffers a single appellate court case from the state of Oregon as analogous authority. It compares this case to *State v. Kline*, 963 P.2d 697 (Or. Ct. App. 1998), in which the Oregon Court of Appeals allowed a probationer's right to father children to be conditioned upon his completion of drug counseling and anger management classes. However, the case at hand would be entirely different had the circuit court merely required Oakley to take a course in financial responsibility or effective parenting, rather than conditioning the right to procreate on an unobtainable requirement of financial wherewithal.

[5] *People v. Pointer*, 199 Cal. Rptr. 357, 366 (Cal. Ct. App. 1984).

not join in the majority's disregard of that right, I dissent.

¶ 64. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice DIANE S. SYKES join this dissent.

¶ 65. DIANE S. SYKES, J. *(dissenting)*. Can the State criminalize the birth of a child to a convicted felon who is likely to be unwilling or unable to adequately support the child financially? That is essentially the crux of the circuit court order in this case, or at least its apparent practical effect.

¶ 66. As a condition of probation for felony nonsupport, the circuit court in this case barred David Oakley from having any more children unless he demonstrates to the court that he is supporting the nine children (by four different women) that he already has, and that he has the financial ability to support another. That is, Oakley must seek the court's permission and obtain the court's approval before bringing another child into the world. He is subject to probation revocation and imprisonment if he fathers a child without prior court approval.

¶ 67. While I sympathize with the circuit court's understandable exasperation with this chronic "deadbeat dad," I cannot agree that this probation condition survives constitutional scrutiny. It is basically a compulsory, state-sponsored, court-enforced financial test for future parenthood.

¶ 68. I agree with the majority opinion that because Oakley is a convicted felon, infringements on his constitutional rights are evaluated differently than infringements on the rights of those who have not been convicted of crimes. The majority opinion has identified

the applicable test: "conditions of probation may impinge upon constitutional rights as long as they are not overly broad and are reasonably related to [the probationer's] rehabilitation." Majority op. at ¶ 19 (quoting *Edwards v. State*, 74 Wis. 2d 79, 84–85, 246 N.W.2d 109 (1976)).

¶ 69. Oakley has fathered nine children by four different women and has consistently failed to support them. He is more than $25,000 in arrears on his support orders, and his pattern of nonsupport is intentional. He is criminally irresponsible, and his children suffer for it. The State's interest in collecting child support for his children is substantial, as is the State's interest in preventing further arrearages.

¶ 70. Under these circumstances, the "no more children" probation condition certainly appears to be reasonably related to Oakley's rehabilitation. No one seems to believe that Oakley will ever be able to bring his arrearages up to date, much less keep current. Adding another child would only make matters worse.

¶ 71. Even under these extreme circumstances, however, and even in light of the State's strong interest in protecting against further victimization of these children, a court-ordered prohibition of procreation without State permission is overly broad.

¶ 72. In *Zablocki v. Redhail*, 434 U.S. 374, 376 (1978), the United States Supreme Court struck down a Wisconsin statute that prohibited the issuance of a marriage license without court approval to anyone with a court-ordered child support obligation. Under the statute, court approval to marry could not be granted unless the marriage applicant proved compliance with the support obligation, and further, that the children covered by the support order were not, and were not likely to become, public charges. *Id.* at 375.

493

The Supreme Court found the statute to be an unconstitutional infringement on the right to marry, because less restrictive means could achieve the state's objective of protecting the interests of children entitled to financial support from non-custodial parents. *Id.* at 390. The Court applied an equal protection analysis, invalidating the statute because it was not "closely tailored" to effectuate the State's interests. *Id.* at 388.

¶ 73. While I recognize that the constitutional tests are somewhat different, *Zablocki* is otherwise closely analogous to this case. Here, as in *Zablocki*, there are less restrictive means available to achieve the State's objectives short of encumbering what everyone agrees is a fundamental human right. As noted by Justice Bradley in her dissent, the circuit court can order Oakley to maintain full-time employment—or even two jobs—as a condition of probation, and to execute a wage assignment to pay off his child support arrearages and satisfy his ongoing support obligations. Wis. Stat. § 767.265. His tax refunds can be intercepted annually. Wis. Stat. § 49.855(4). Liens can be placed on his personal property, and he can be found in civil contempt. Wis. Stat. §§ 767.30, 785.03. He can be criminally prosecuted for any additional intentional failures to support his children, present or future. His probation can be revoked if he fails to maintain employment and make support payments. Granted, Oakley's arrearages are so great, and his history so troublesome, that these means may not ultimately be completely successful in achieving the State's objective of collecting child support. But the same was true in *Zablocki*, and the Supreme Court nevertheless found the statute

in that case unconstitutional. I reach the same conclusion here.[1]

¶ 74. This condition of probation subjects Oakley to imprisonment if he fathers another child without advance permission from the State. Illegitimacy and child poverty, abuse, and neglect are among our society's most serious and intractable problems. Conditioning the right to procreate upon proof of financial or other fitness may appear on the surface to be an appropriate solution in extreme cases such as this, but it is unprecedented in this country, and for good reason. The State can order non-custodial parents to financially support their children, and can criminally prosecute those who intentionally do not. The State can remove a child from a parent's custody when the child is in need of protection from parental abuse, neglect, or abandonment, and can criminally prosecute parents who mistreat their children. But I know of no authority for the proposition that the State can order that a child not be conceived or born, even to an abysmally irresponsible parent, unless the State first grants its consent.

¶ 75. Although Oakley is a convicted felon and therefore may constitutionally be subjected to limitations on the fundamental human liberties the rest of us freely enjoy, he cannot constitutionally be banned from having further children without court permission. In light of available alternatives to achieve the State's significant and laudable objective of collecting past and future child support for these children, who are enti-

---

[1] I am not, by this conclusion, applying a "strict scrutiny" equal protection test, as suggested by the majority opinion. Majority op. at ¶ 16 n.23. As I have noted, I am applying the test from *Edwards v. State*, 74 Wis. 2d 79, 84–85, 246 Wis. 2d 109 (1976).

tled to and need it, this condition of probation is an overly broad encumbrance on Oakley's right to procreate, and therefore cannot stand. Accordingly, I respectfully dissent.

¶ 76. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice ANN WALSH BRADLEY join this dissenting opinion.