COURT OF APPEALS
DECISION
DATED AND FILED

September 10, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2024AP1634**

Cir. Ct. No. 2023JC113

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

IN THE INTEREST OF X.V., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

   PETITIONER-RESPONDENT,

 V.

A.C.S.,

   RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Kenosha County: BRUCE E. SCHROEDER, Judge. *Order reversed and cause remanded for further proceedings*.

¶1     GROGAN, J.[1]  Anna[2] appeals from a dispositional order entered after a jury found her child was in need of protection or services (CHIPS).  The order transferred custody of the child to the Department of Human/Social Services, placed the child outside of the parental home, and provided the termination of parental rights (TPR) notice.  Anna raises two issues on appeal.  First, she contends the temporary physical custody order entered under WIS. STAT. § 48.205 lacked sufficient evidence to warrant that intervention.  Second, she argues the circuit court erred when it concluded she lacked legal authority to place her child in the care of another due to her conditions of probation; that this error prevented the jury from hearing evidence related to the issue of whether her child was in need of protection of services; and that the exclusion of this evidence was not harmless.  This court agrees that the circuit court erred in preventing Anna from introducing evidence regarding the power of attorney she used to place her child in the care of another and therefore reverses and remands for further proceedings consistent with this opinion.

## I. BACKGROUND

¶2     After the death of her fifth child, Jacob,[3] Anna pled no contest to causing his death via neglect.  Sentence was withheld, and Anna was placed on probation for ten years.  As a condition of her probation, Anna was ordered to have "[n]o care of any children without approval of [her Department of

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

[2] Anna is a pseudonym.

[3] Jacob is also a pseudonym.

Corrections (DOC)/Probation and Parole] agent or DCFS."[4] Apparently, DOC later modified this condition, although it is not entirely clear why or when, to require the approval of both DCFS *and* Probation and Parole rather than only requiring approval of one or the other. It does not appear that this condition was removed at any point and therefore remained in effect on March 15, 2023, when Anna gave birth to Francis,[5] her ninth child.[6]

¶3    Over the course of a six-day factfinding jury trial as to whether Francis was a child in need of protection or services, the jury heard substantial testimony regarding Anna's whereabouts and living arrangements in Kenosha and Milwaukee Counties as well as her contact—and at times lack thereof—with various individuals overseeing her probation and the CHIPS cases involving some of her other children. For example, the jury heard that Anna had moved to Milwaukee prior to Francis's birth, that she was participating in the "SHE" program, which Anna explained stands for "Supportive Housing Environment," that she gave birth to Francis in Milwaukee, that both she and Francis tested negative for drugs upon Francis's birth but that Francis's meconium tested positive for cocaine (a result that Milwaukee County had apparently anticipated), and that Anna was utilizing various services to help support Francis.

---

[4] DCFS is an acronym for Department of Children and Family Services. Although different counties may refer to similar departments by different titles, this opinion uses "DCFS" for consistency and will refer to the specific County as necessary (Kenosha County DCFS; Milwaukee County DCFS).

[5] Francis is a pseudonym.

[6] As a result of this condition and Anna's failure to meet the conditions of return pertaining to three of her children, Kenosha DCFS detained Anna's sixth, seventh, and eighth children at birth.

¶4    It was also abundantly clear from the testimony that both Kenosha County DCFS and Anna's probation agent in Kenosha County not only knew that Anna was pregnant with Francis, but also that she had given birth to Francis in Milwaukee County and that Francis remained in her care. The jury also heard concerns her Kenosha County social worker and probation agent had when Anna's contact and communication became less frequent, that Milwaukee County DCFS workers had contact with Anna both prior to and after Francis's birth and that they did not have concerns regarding his safety, that there was an apparent breakdown in communication between Milwaukee County DCFS and Kenosha County DCFS,[7] and that multiple attempts to transfer Anna's supervision from Kenosha County to Milwaukee County failed largely, if not entirely, due to Anna's failure to maintain contact with the Milwaukee County probation agent.

¶5    It is unnecessary to recount more specific details of the aforementioned testimony further, however, because those details ultimately have little bearing on the disposition of this appeal.[8] What is relevant here is that approximately three months after Francis's birth—a birth of which all of Anna's supervising agents and workers were seemingly aware—Anna's Kenosha County probation agent issued a probation warrant for Anna's arrest because Anna had failed to communicate and the agent was unaware of Anna's, as well as Francis's, whereabouts. Anna became aware of the warrant shortly thereafter and not

---

[7] The apparent breakdown in communication between the various agencies in Kenosha County and Milwaukee County, along with the finger-pointing that was evident upon review of the Record, is troubling.

[8] This is not to say that these details are unimportant in regard to whether or not Francis is or was a child in need of protection or services. They are unnecessary to recount here simply because, as will be set forth in greater detail, legal errors unrelated to this specific testimony are dispositive of the issues raised on appeal.

wanting the State to take custody of Francis in the event of her arrest, Anna arranged for her friend Rachel[9] to take temporary guardianship of Francis via a power of attorney. On June 15, 2023, Anna and Rachel signed a document titled "Power of Attorney Delegating Parental Power" so Rachel would be responsible for caring for Francis. (Formatting altered.) Rachel lived with her long-term romantic partner, Beth; however, the power of attorney document assigned legal authority to Rachel only.[10] Two days after signing the power of attorney document, officers arrested Anna.

¶6 Following Anna's arrest, Jason Burke, a Kenosha County DCFS agent, was tasked with investigating whether Francis was in a safe environment. Burke determined that the document Rachel and Beth presented to him when he arrived at their home "appeared to be a legal power of attorney," that "[t]he home was adequate[,]" that "[Rachel and Beth] appeared bonded with [Francis]," that "[t]hey had [an] adequate amount of food[ and] diapers," and that "there were no identifiable visible threats of safety." Burke therefore decided not to detain Francis at that time, and Francis remained in Rachel and Beth's care.

¶7 Although it is unclear how, on June 23, 2023—approximately one week after Anna's arrest—Kenosha County Circuit Court Judge Chad Kerkman learned that Rachel and Beth were caring for Anna's child and apparently

---

[9] Rachel and Beth, who is referenced later in this paragraph, are both pseudonyms. Although Beth was Anna's long-time attorney in CHIPS and TPR matters related to Anna's other children, Beth did not represent Anna in any proceeding related to Francis.

[10] According to trial testimony, the parties were initially unaware that Anna knew Rachel and Beth independently of each other. At some point, however, the parties all became aware of these relationships. Trial testimony also established that Rachel and Beth had watched Francis on multiple occasions prior to Anna's June 2023 placement of Francis with Rachel under the power of attorney arrangement.

determined that the power of attorney agreement between Anna and Rachel was legally invalid.[11]  Although the Record is sparse as to how Judge Kerkman learned this information and the circumstances under which he reviewed the power of attorney and then "ruled" or otherwise determined it was invalid, it was represented throughout the course of the proceedings that Judge Kerkman reasoned that the power of attorney was invalid because Beth's involvement amounted to an ethical violation of SCR 20:1.7 and 20:1.8.[12]  Having apparently concluded the power of attorney was unenforceable and that Francis therefore had no legal caregiver given Anna's in-custody status, Judge Kerkman, acting as an intake worker pursuant to WIS. STAT. § 48.10, placed Francis in emergency custody.  As a result, Kenosha County DCFS removed Francis from Rachel and Beth's home and placed him in foster care.

¶8      On June 26, 2023, three days after Judge Kerkman placed Francis in emergency custody, a Kenosha County Circuit Court Commissioner conducted a temporary physical custody hearing pursuant to WIS. STAT. § 48.21.  When Anna's attorney attempted to dispute the alleged ethical violation on the basis that there was no conflict of interest under the rules, the court commissioner cut her argument short based on his belief that he did not have any "legal authority to invalidate a Circuit Court Judge's decision that a power of attorney [is] invalid."

---

[11] Perhaps because the Record is so sparse as to Judge Kerkman's involvement, there is no information regarding the circumstances under which he apparently reviewed and then declared the power of attorney legally invalid.  The parties likewise have provided very little information as to the specific legal process of Judge Kerkman's review.

[12] At the June 26, 2023 temporary physical custody hearing before a court commissioner, the assistant district attorney represented that "Judge Kerkman was informed … that the power of attorney was executed to the -- basically the residence of [Beth, Anna's attorney in other matters] and determined that that power of attorney due to ethical violations was invalid."

The court commissioner therefore found that the circuit court had jurisdiction over Francis under WIS. STAT. § 48.13(8) and 48.13(10m) and placed Francis in a foster home.

¶9      Following the temporary physical custody hearing, the Kenosha County district attorney's office filed a CHIPS petition on June 28, 2023, followed by an amended petition the next day.[13]  In the petition, the State alleged the circuit court had jurisdiction over Francis under WIS. STAT. § 48.13(8) (inadequate care during parental unavailability), § 48.13(10) (neglect), and § 48.13(10m) (risk of neglect).   The petition referenced, inter alia, Anna's arrest, Judge Kerkman's conclusion that the power of attorney was invalid due to an ethical violation, Francis's health, and prior CHIPS and TPR proceedings involving Anna's other children.

¶10      Anna requested a de novo review of the court commissioner's temporary physical custody order, which the circuit court conducted on September 5, 2023—more than two months after the initial temporary physical custody hearing.  At the de novo hearing, Anna essentially argued that the court was required to consider the criteria set forth in WIS. STAT. § 48.205(1) and that grounds to hold Francis did not exist because there was no "[p]robable cause … to believe that … [an]other responsible adult [e.g. Rachel or Beth] [wa]s neglecting, refusing, unable or unavailable to provide adequate supervision and care and that services to ensure the child's safety and well-being are not available or would be inadequate[,]" which is what the statute requires.  *See* § 48.205(1)(b).

---

[13] All subsequent references to the CHIPS petition refer to the amended petition filed on June 29, 2023, unless otherwise indicated.

7

¶11     Ultimately, the circuit court upheld the order based on its conclusion that there was "great uncertainty" about Francis's whereabouts and about "whether [Francis] was receiving adequate care[.]"  The court also dismissed Jason Burke's report concluding that Rachel and Beth had been caring for Francis and that their home was a suitable environment for Francis, stating "I don't know this person Burke. … I don't know anything about the credentials of this individual.  I haven't seen any report like that."[14]  The court also referenced what it believed to be Anna's inability to confer custodial rights, stating that it was being asked to place Francis with Rachel and Beth "on the mere basis that they were nominated on a power of attorney … by someone who's under a court order not to care for a child."  Accordingly, the court explained that it was "not going to change any aspect" of the order entered following the initial temporary physical custody hearing held before the court commissioner.

¶12     Two weeks after the circuit court's de novo review of the temporary physical custody order, a twelve-person jury heard evidence over the course of a six-day factfinding trial, *see* WIS. STAT. § 48.31, regarding the allegations set forth in the CHIPS petition.  On the third day of trial, Anna's counsel cross-examined Jason Burke, the Kenosha County DCFS agent who had initially investigated Francis's placement with Rachel and Beth following Anna's arrest, and attempted to ask him whether he would have removed Francis from Rachel and Beth's home if, hypothetically, there had been no legal power of attorney delegating parental

---

[14] The circuit court conceded that "maybe" such a report was filed but complained that "this case [had] pounced on [it] unexpectedly" and that it had "tried to keep up as much as" possible.

authority to Rachel at that time. Before Burke could complete his answer, the court interrupted, telling the jury that:

> [T]here was an order by [the judge in the criminal case] when [it] sentenced [Anna], that [Anna] was to abide by the rules and regulations of the Department of Corrections.
>
> The Department of Corrections added a condition that [Anna] was not to have care of children. I think I've already indicated at a pretrial ruling that any so-called power of attorney authorized by [Anna] while she was under those court orders was not lawful.

At that point, Anna's counsel interjected to clarify that the probation condition only restricted Anna's ability to care for Francis if there was no permission to do so from the DOC or DCFS and that counsel wished to introduce evidence that such permission had been granted. Following a lengthy discussion outside the jury's presence, the court informed Anna's attorney that if she made any suggestion that the power of attorney was legally valid, it would interrupt counsel and instruct the jury that the power of attorney was invalid and unenforceable.

¶13 On the fifth day of trial, Anna's attorney called Beth to testify and asked her whether she was aware of any safety concerns at her home at the time of Francis's detainment. The circuit court, apparently assuming counsel intended to reference the power of attorney in some manner, again intervened, stating:

> Folks, I think we've had some discussion about this earlier, but an order had been made by [the criminal court] placing [Anna] on supervision, probation, subject to the orders of the Court, the judge's orders and orders of the Department of Corrections which were authorized by the judge.
>
> And those orders provided that [Anna] … was not permitted to have care of any child. There was a court order enforceable through the criminal court by -- well, it could affect the status of [Anna's] probation, it could be treated as a contempt of the Court, any disobedience. It could lead to revocation of probation. And it was a binding court order.

> Under that order, because [Anna] was not permitted to have the care of a child, that also legally deprived her of the right to delegate her parental responsibilities to other persons. That was by court order under the supervision of the Department of Children and Family services.
>
> So I'm not going to permit this particular question to be asked. And keep in mind that because of the order which was made by [the criminal court] and the subsequent order of detention by Judge Kerkman, [Anna] had no lawful authority to entrust the child's care to anyone at all.

¶14 The jury ultimately rendered a divided verdict. While all twelve jurors found that Francis had been at risk of neglect under WIS. STAT. § 48.13(10m), only ten jurors found that Anna had actually neglected Francis under WIS. STAT. § 48.13(10). The jury unanimously agreed that Francis was not receiving inadequate care during Anna's unavailability under WIS. STAT. § 48.13(8). Based on the jury's verdict, the circuit court entered a dispositional order continuing Francis's placement in foster care. Additional facts will be set forth below as necessary. Anna appeals.

## II. STANDARD OF REVIEW

¶15 Whether grounds exist to enter an order for temporary physical custody pursuant to WIS. STAT. § 48.205(1) requires a circuit court to exercise its discretion. "A circuit court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and using a demonstrated rational process reaches a conclusion that a reasonable judge could reach." *Dane Cnty. DHS v. Mable K.*, 2013 WI 28, ¶39, 346 Wis. 2d 396, 828 N.W.2d 198. "[W]hether the circuit court applied proper standards of law" is subject to de novo review, as appellate courts "review questions of law independent of the" circuit court. *Id.*

¶16    This court also reviews a circuit court's decision to admit or exclude evidence under the erroneous exercise of discretion standard, *see* ***Morden v. Continental AG***, 2000 WI 51, ¶81, 235 Wis. 2d 325, 611 N.W.2d 659, and will not upset the circuit court's decision if that decision "has 'a reasonable basis' and was made 'in accordance with accepted legal standards and in accordance with the facts of record.'" ***Lievrouw v. Roth***, 157 Wis. 2d 332, 348, 459 N.W.2d 850 (Ct. App. 1990) (citations omitted).

¶17    If the circuit court erroneously exercised its discretion, appellate courts must then determine whether the error requires reversal:

> No judgment shall be reversed or set aside or new trial granted in any action or proceeding on the ground of … error as to any matter of pleading or procedure, unless … after an examination of the entire action or proceeding, it shall appear that the error complained of has affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure a new trial.

*See* WIS. STAT. § 805.18(2).  An error affects a party's substantial rights if there is "a reasonable possibility that the error contributed to the outcome of the action or proceeding at issue." ***Evelyn C.R. v. Tykila S.***, 2001 WI 110, ¶28, 246 Wis. 2d 1, 629 N.W.2d 768.  "[A] reasonable possibility [is] one which is sufficient to undermine the confidence in the outcome of the proceeding." ***State v. Patricia A.M.***, 176 Wis. 2d 542, 556, 500 N.W.2d 289 (1993).  "[A] reviewing court must look to the totality of [the] record and determine whether the error contributed to the trial's outcome." ***Id.*** at 556-57.  If the error does not undermine confidence in the outcome, the error is harmless. ***Evelyn C.R.***, 246 Wis. 2d 1, ¶28.

## III. DISCUSSION

¶18    Anna argues the circuit court erred in entering an order for temporary physical custody pursuant to WIS. STAT. § 48.205 upon its de novo review, and that it also erred when it concluded that Anna's conditions of probation prevented her from granting Rachel power of attorney to care for Francis.  She further asserts that both errors biased the jury against Anna because the errors "communicat[ed] to them that Beth and Rachel's home was inappropriate" and that "[t]he erroneous instruction" regarding Anna's ability to sign a power of attorney for Francis "biased the jury against [her] by telling the jury something that should have redounded to her benefit—finding safe care for her child—was itself illegal."  Because the validity of the power of attorney is intertwined with both issues, this court begins by addressing the power of attorney-related arguments and then addressing the power of attorney within the specific context of each issue Anna raises on appeal.

### A. *Impact of Judge Kerkman's Conclusion That the Power of Attorney Was Invalid*

¶19    This matter involving Francis effectively began when, pursuant to WIS. STAT. § 48.10, the Honorable Judge Kerkman undertook "[t]he duties of [an] intake worker[.]"[15]  As noted, the Record is sparse as to how Judge Kerkman learned that Francis was residing with Rachel and Beth following Anna's arrest, how he obtained a copy of the power of attorney at issue, the circumstances under which he reviewed that document, and what information he had before him at the time he concluded that it was invalid.  Apparently, the extent of what is known is

---

[15] Because of his involvement as the intake worker in this matter, Judge Kerkman was disqualified from further participation in these proceedings.  *See* WIS. STAT. § 48.10.

12

essentially as described in the Temporary Physical Custody Request filed on June 26, 2023:

> Judge Chad Kerkman acted as the Intake Worker under [§] 48.10, and ordered that this child be taken into physical custody and detained in foster care pending a detention hearing. Judge Kerkman stated the current [power of attorney] on file is invalid due to an ethical violation under SCR 20:1.7 and 20:1.8, and that the child is currently without a parent or guardian. The mother is incarcerated on a PO hold in the Kenosha County Jail, and the father's paternity status is only alleged at this time.

Neither the appellate Record nor either party provided any additional substantive information regarding Judge Kerkman's involvement or his decision-making process regarding the alleged invalidity of the power of attorney.

¶20 It is undisputed, however, that Judge Kerkman had authority to act as an intake worker, and Anna acknowledges that Judge Kerkman's actions in and of themselves are likely "not independently reviewable as part of this CHIPS appeal" because Judge Kerkman "was functioning as an intake worker, not a tribunal." Even if Judge Kerkman's actions as an intake worker, standing alone, are not subject to review, Judge Kerkman's conclusion that the power of attorney was invalid due to an alleged ethical violation *is* subject to review given the extent to which that decision permeated the entirety of these proceedings, as evidenced by the fact that the court commissioner and Judge Schroeder both referenced and effectively accepted that "ruling" as the law of the case throughout these proceedings. Moreover, Judge Kerkman's "legal ruling," at least in part, served as a basis for excluding evidence related to the power of attorney and Anna's attempts to secure care for Francis prior to her arrest.

¶21 Turning to the power of attorney, that document cites WIS. STAT. § 48.979 and purports to authorize Rachel—and *only* Rachel—as Anna's delegate

13

for care and custody of Francis. Importantly, although Rachel and Beth were in a romantic relationship and lived together, which apparently served as the basis for Judge Kerkman's conclusion that the power of attorney was invalid due to an ethical violation on Beth's part, that document does *not* name Beth as a delegate. This court is unaware of any legal authority stating that a power of attorney is invalid because the delegate named therein is in a romantic relationship with the delegating party's attorney in other matters, and the parties on appeal have likewise failed to identify any such authority. This court is similarly unaware of any legal authority supporting the conclusion that such a scenario would result in an ethical violation of the Wisconsin Supreme Court Rules of Professional Conduct for Attorneys, "SCRs," given that Rachel, the individual to whom care was transferred, is not an attorney. And, even if this court was to conclude that *Beth*'s involvement in this matter rose to the level of an ethical violation in some manner, there is no support for the conclusion that the ensuing remedy is the invalidation of a legal document to which the attorney who violated the rules is not a named party.[16] Again, the parties likewise do not cite any such authority—the State simply relies on Judge Kerkman's "ruling."

¶22 Having reviewed the Record, it does not appear that Anna was ever afforded the opportunity at any point to challenge the conclusion that the power of attorney was invalid due to an ethical violation. In fact, on the third day of trial, Anna's attorney asserted that "a power of attorney cannot just be invalid *without a case on it. The mother and the other party to the power of attorney had no ability*

---

[16] In Wisconsin, the Office of Lawyer Regulation, which is overseen by the Wisconsin Supreme Court, handles disciplinary matters related to alleged misconduct and other alleged violations of the Rules of Professional Conduct for Attorneys. *See* https://www.wicourts.gov/courts/offices/olr.htm.

14

*to have any sort of case or hearing on that except for right now*." (Emphasis added.) Although made in the context of whether Anna's conditions of probation prevented her from signing the power of attorney at all, which will be discussed below, it also establishes that she was not afforded the opportunity to argue at any point during these proceedings that the power of attorney was *not* invalid due to a purported violation of the Wisconsin Supreme Court Rules of Professional Conduct for Attorneys.

¶23    Accordingly, because Anna was not afforded an opportunity to challenge the conclusion that the power of attorney was invalid due to a purported ethical violation by an individual not named in the power of attorney document itself, the circuit court erred when it excluded evidence during the jury trial on the basis that an ethical violation voided the power of attorney.

### B.  Conditions of Probation and Impact on Power of Attorney

¶24    Throughout the course of these proceedings, the circuit court repeatedly referenced Anna's probation condition that she could not care for any child without approval from her probation agent or DCFS, which DOC later supplemented to require approval from *both* her agent and DCFS.  According to the court, this condition inherently left Anna without any legal authority to name an individual to care for Francis, and based on that conclusion, the court prevented Anna from introducing evidence related to the power of attorney during the trial. The circuit court was incorrect.[17]

---

[17] The circuit court was also dismissive of the fact that the condition allowed Anna to have care of her child so long as she had permission and instead seemingly viewed the condition as a blanket prohibition.  This, too, was erroneous.

¶25 It is without question that circuit courts have the authority to impose conditions of probation. *See, e.g.*, **State v. Oakley**, 2000 WI 37, ¶8, 234 Wis. 2d 528, 609 N.W.2d 786 (explaining that circuit courts have "broad discretion in imposing conditions of probation"); WIS. STAT. § 973.09(1)(a). It is also well-established that probationers, because they are still serving an imposed sentence, have conditional liberties because "a convicted person's status as a probationer 'is a matter of grace or privilege and not a right[.]'" **State v. Evans**, 77 Wis. 2d 225, 230, 252 N.W.2d 664 (1977) (citation omitted), *abrogated on other grounds by* **State v. Spaeth**, 2012 WI 95, 343 Wis. 2d 220, 819 N.W.2d 769.

¶26 Here, the criminal court imposed the probation condition that Anna not be allowed to care for any child without approval from certain non-court entities and/or individuals, and Anna does not challenge that condition. What she challenges in this appeal is the circuit court's conclusion in the CHIPS action that the condition imposed in her criminal case *legally* altered her parental status as to Francis. This court concludes it did not.

¶27 Although there does not appear to be, at least to this court's knowledge, case law specifically addressing whether a condition of probation limiting a parent's ability to care for a child also serves to alter that parent's legal status and authority to make decisions about that child's care, it is axiomatic that *someone*—whether that be a parent, guardian, the court system, etc.—must, at all times, have legal authority to make such decisions on behalf of the child. It is clear, however, that before the judicial system may alter parental rights in some manner, there must be a formal legal proceeding directly related to that child. *See, e.g.*, WIS. STAT. chs. 48, 767, and 822. Thus, while the criminal court clearly had jurisdiction over Anna and was within its bounds to limit Anna's ability to physically care for her child, it did not have jurisdiction over Francis. In other

16

words, while Anna's condition of probation clearly prevented her from having *physical* custody of Francis in the absence of approval from DOC and DCFS, the condition did not inherently prohibit her from having *legal* custody of Francis. To the contrary, absent a court order transferring legal custody of Francis to the State, legal custody resided with Anna and Anna alone despite the probation condition.[18] *See, e.g.*, WIS. STAT. § 767.82(2m) (explaining that where there is no presumption of paternity or if paternity has not been established via genetic testing, "the mother shall have sole legal custody of the child until the court orders otherwise").

¶28 Consequently, the only reasonable conclusion is that absent an official proceeding wherein a circuit court established jurisdiction over Francis and thereafter formally transferred legal custody from Anna, Anna remained the only individual with legal custody of Francis at the time she purportedly granted power of attorney to Rachel. Accordingly, despite the condition of probation preventing her from caring for Francis without permission, this did not inherently prevent her from leaving her child in someone else's care. This conclusion does not, however, prevent the State from initiating a case to bring a child under the court's jurisdiction. Given the nature of the matter currently under appeal, it is clear that the State and its representatives know how to do so and, having reviewed the Record in its entirety, it is clear that the State and its representatives knew how to do so in the case of Anna's prior children—including those who were born while this very same condition of probation was in effect—and that it

---

[18] At least as of the time of the jury trial, Francis's father was only an alleged father.

This court also notes that the dispositional order states that "[l]egal custody [of Francis]" was "transferred to" "County Department of Human/Social Services." Although the order does not state from whom the legal custody is being transferred, the logical conclusion is that legal custody was being transferred *from Anna*.

therefore knew how to do so in Francis's case as well. However, it did not do so in Francis's case, and at its core, the State's only explanation is a lack of communication between individuals overseeing Anna's cases, apparent disagreement between those individuals when they did communicate, and a significant amount of finger-pointing.

¶29 In reaching this conclusion, this court necessarily rejects the State's reliance on *State v. Oakley*, 2001 WI 103, 245 Wis. 2d 447, 629 N.W.2d 200, *opinion clarified on denial of reconsideration*, 2001 WI 123, 248 Wis. 2d 654, 635 N.W.2d 760, a case in which our supreme court concluded that a condition of probation that Oakley not father additional children while on probation without first establishing he could support his current children was not overly broad and was reasonably related to the underlying conviction, because it is readily distinguishable. First, in *Oakley*, the probation condition applied specifically to hypothetical children who did not already exist, not to children, such as Francis, who had already been born. *See id.*, 245 Wis. 2d 447, ¶1. Second, in *Oakley*, the supreme court explained that the circuit court did not erroneously exercise its discretion in imposing the condition because Oakley "could have been imprisoned for six years, which would have eliminated his right to procreate altogether during those six years," and consequently "this probation condition, which infringes on his right to procreate during his term of probation, *is not invalid under these facts*." *Id.* (emphasis added). Although the probation condition imposed upon Oakley was tangentially related to parental rights in that it foreclosed him from *having* additional children, it did not, and could not, impact his parental or custodial rights over children that did not exist. Here, however, Francis *did* exist, and *Oakley* is therefore inapposite.

18

¶30   In summary, the circuit court erred in construing Anna's condition of probation as having altered her legal status as a parent over children who themselves were not otherwise under the court's jurisdiction and as limiting her consequent ability to make decisions on Francis's behalf.  The implications of the court's erroneous conclusion as it relates to the issues Anna raises on appeal regarding the jury trial and ensuing CHIPS order will be addressed more fully below.[19]  It is important to note, however, that in reaching this conclusion, this court neither disregards nor seeks to diminish the serious concerns multiple individuals had regarding Francis's care, particularly following Anna's arrest.  As WIS. STAT. § 48.01(1)(a) explains, the "protect[ion] [of] children and unborn children" is among the "paramount goal[s]" set forth within the Children's Code, *see* WIS. STAT. ch. 48.  However, that objective cannot be obtained when required legal procedures are not followed and corners, for lack of a better explanation, are cut, which appears to have been the case here.

---

[19] Although this court concludes that the circuit court's conclusions regarding the power of attorney were erroneous as a matter of law, that conclusion does not preclude the possibility that the power of attorney was invalid on other grounds.  For example, the State notes in its Response—as it did at trial—that it does not appear that the notary public, despite having stamped the document, actually *signed* the power of attorney document, which the State says is required by WIS. STAT. § 140.147.  While this court questions the State's largely undeveloped assertion that § 140.147, a statute that governs "[n]otarial act[s] performed for remote execution of estate planning documents," would apply in this case, the State is not foreclosed from raising this argument on remand, as it does not appear to have been explicitly addressed.  The State is likewise not precluded from raising additional arguments regarding the validity of the power of attorney that have not already been explicitly addressed in a judicial forum should it choose to do so.  However, even if the State would successfully establish that the power of attorney is invalid, such a conclusion would not inherently prevent Anna from introducing evidence that she *attempted* to authorize a power of attorney, as such evidence could be considered relevant as to Anna's state of mind and attempts to provide for Francis's care.

*C. De Novo Review*

¶31     Having addressed the erroneous conclusions made in regard to the legality and enforceability of the power of attorney on the specific grounds described above, this court now turns to Anna's argument that the circuit court, in its de novo review of the temporary physical custody order, erred in placing Francis outside of Rachel and Beth's home prior to the CHIPS trial.

¶32     At the outset, this court notes that the State, in its Response brief, argues that Anna waived her ability to contest the circuit court's de novo review decision. According to the State, because "[a] De Novo hearing is a non-final order[,]" "pursuant to [WIS. STAT. RULE] 809.50[,]" Anna was required "to file a petition within 14 days of the ruling, and then seek leave from the appellate court to submit an interlocutory appeal[,]" which Anna did not do. The State is incorrect. Pursuant to WIS. STAT. RULE 809.10(4), "[a]n appeal from a final judgment or final order *brings before the court all prior nonfinal judgments, orders and rulings* adverse to the appellant and favorable to the respondent made in the action or proceeding not previously appealed and ruled upon." (Emphasis added.) The non-final order arising from the circuit court's de novo review of the temporary physical custody issue was clearly adverse to Anna, and it therefore falls squarely under RULE 809.10(4). This court therefore rejects the State's assertion that Anna waived this argument on appeal.

¶33     Turning to Anna's challenge to the de novo review, WIS. STAT. § 48.205(1)(b), the ground upon which the State sought the temporary physical custody order, provides that:

> **(1)** A child may be held under [WIS. STAT. §§] 48.207(1), 48.208 or 48.209 if the intake worker determines that there

20

is probable cause to believe the child is within the jurisdiction of the court and:

....

(b) Probable cause exists to believe that the parent, guardian or legal custodian of the child *or other responsible adult* is neglecting, refusing, unable or unavailable to provide adequate supervision and care and that services to ensure the child's safety and well-being are not available and would be inadequate.

(Emphasis added.) Anna acknowledges in her appellate brief that her "history alone probably amounted to probable cause for [WIS. STAT. § 48.13](10m)" and that "there was probable cause for the petition that was filed." She asserts, however, that there was insufficient evidence to conclude that "*other responsible adult*[*s*]"—here, Rachel and Beth—were "neglecting, refusing, unable or unavailable to provide adequate supervision and care and that services to ensure the child's safety and well-being are not available or would be inadequate." *See* § 48.205(1)(b) (emphasis added).[20]

¶34 According to Anna, the circuit court, in its de novo review, erroneously exercised its discretion because despite "tacitly acknowledg[ing] that Francis's safety did not really turn on the validity of the power of attorney[,]" it nevertheless concluded that "'there's great uncertainty about whether the child was receiving adequate care and where the child was'" at the time Francis was removed from Rachel and Beth's home. Anna says "[t]his finding was error

---

[20] In its Response brief, the State asserts that the circuit court did not err in concluding that the temporary physical custody order was appropriate because WIS. STAT. § 48.205(1)(c) provides that a child may be held if "[p]robable cause exists to believe that the child will run away or be taken away so as to be unavailable for proceedings of the court or its officers." Because this court concludes that the circuit court's conclusion was not erroneous, it is not necessary to independently consider this ground as a basis to support the court's conclusion.

because it relied on incorrect facts[,]" as it was known that Francis had been in Rachel and Beth's care—and was seemingly well-cared for—at the time he was detained and that this "factual mistake resulted from [the circuit court's] application of an improper legal standard."

¶35    While this court shares Anna's concern that delaying a de novo review hearing on a temporary physical custody order until a significant amount of time passes (here, more than two months) can, as Anna puts it, "calcify" an erroneous decision before it can be reviewed on appeal, this court cannot conclude that the circuit court erroneously exercised its discretion in regard to the temporary physical custody order.

¶36    In holding the de novo temporary physical custody hearing, the circuit court was effectively tasked with viewing the evidence known at the time Francis was removed from Rachel and Beth's home.  Although Francis's whereabouts were obviously known at the time Francis was removed, there had been valid concerns about his whereabouts following Anna's arrest, particularly in light of Anna's well-known history of TPR, CHIPS, and criminal cases.  There were also valid concerns, despite WIS. STAT. § 48.205(1)(b)'s reference to "other responsible adult[s]" providing care, about the circumstances in which Francis was placed in Rachel and Beth's home given that Beth represented Anna in various matters involving Anna's other children and little appeared to have been otherwise known about Anna's relationship with Rachel and Beth or their history of caring for children.[21]

---

[21] This is not to say that Beth and Anna's attorney-client relationship rendered Beth incapable of caring for Francis; however, given the fluidity of what was known at the time of Francis's removal, that relationship was a valid consideration.

¶37 Additionally, although Burke, the Kenosha County DCFS worker who responded to Rachel and Beth's home upon learning Francis was in their care, apparently did not have immediate concerns about Francis's well-being, the circuit court was not required to simply accept and follow that worker's assessment. Rather, the court was well within its discretionary authority to consider that as just one of multiple pieces of information. And, even if there had been no concerns regarding the validity of the power of attorney, WIS. STAT. § 48.979(1)(d)4 confirms that even if a power of attorney exists, a court may "exercis[e] jurisdiction over the child under [WIS. STAT. §] 48.13"—meaning that the power of attorney alone was not sufficient to prevent the court from entering an order for temporary physical custody.

¶38 Based on the foregoing, this court cannot conclude that the circuit court's ruling as to the de novo review of temporary physical custody was clearly erroneous.

### D. The CHIPS Order

¶39 Turning to the CHIPS order entered following the jury trial, Anna argues that the circuit court's conclusion that she had no legal authority to sign a power of attorney regarding Francis's care was erroneous and that the circuit court's repeated instruction/explanation to the jury that Anna lacked such authority biased the jury. In essence, Anna's argument amounts to one that the court, based on its legal conclusion, erroneously excluded relevant evidence regarding the power of attorney and surrounding circumstances, that the manner in which the circuit court explained to the jury why the evidence was excluded introduced bias, and that such error was not harmless. This court agrees.

¶40     Here, the jury was asked to determine whether Francis was in need of protection and services on three grounds: WIS. STAT. § 48.13(8), 48.13(10), and 48.13(10m).     Pursuant to those subsections, a "court has exclusive original jurisdiction over a child alleged to be in need of protection or services which can be ordered by the court if"

> **(8)** The child is receiving inadequate care during the period of time a parent is missing, incarcerated, hospitalized or institutionalized.
>
> ….
>
> **(10)** The child's parent, guardian or legal custodian neglects, refuses or is unable for reasons other than poverty to provide necessary care, food, clothing, medical or dental care or shelter so as to seriously endanger the physical health of the child.
>
> **(10m)** The child's parent, guardian or legal custodian is at substantial risk of neglecting, refusing or being unable for reasons other than poverty to provide necessary care, food, clothing, medical or dental care or shelter so as to endanger seriously the physical health of the child, based on reliable and credible information that the child's parent, guardian or legal custodian has neglected, refused or been unable for reasons other than poverty to provide necessary care, food, clothing, medical or dental care or shelter so as to endanger seriously the physical health of another child in the home.

Sec. 48.13(8), (10), and (10m).  The jury: (1) unanimously agreed that Francis was *not* receiving inadequate care while Anna was incarcerated (§ 48.13(8)); (2) unanimously agreed that Anna was "at substantial risk of neglecting, refusing, or being unable for reasons other than poverty to provide necessary care for

[Francis] so as to seriously endanger his physical health" (§ 48.13(10m));[22] and (3) reached a 5/6ths verdict (10 of 12 jurors) agreeing that Anna "neglect[ed], refuse[d], or was … unable for reasons other than poverty to provide necessary care, food, clothing, medical or dental care, or shelter for [Francis] so as to seriously endanger [Francis's] physical health" (§ 48.13(10)).

¶41     Anna's principal defense at trial was that Francis had not been neglected and had not been at risk of neglect because, pursuant to the power of attorney, he was living with and receiving adequate care from Rachel and Beth. However, the circuit court repeatedly prevented Anna's counsel from introducing evidence supporting this theory of defense based on its erroneous conclusion of law that Anna was without any authority to make a delegation of parental authority.

¶42     Given the jury's verdicts and the nature of the excluded evidence— that Anna signed (or even that she attempted to sign) a power of attorney regarding Francis's care during the time she was incarcerated—this excluded evidence was clearly relevant. *See* WIS. STAT. § 904.01 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); WIS. STAT. § 904.02 ("All relevant evidence is admissible, except as otherwise provided by the constitutions of the

---

[22] The circuit court answered the first part of this question—whether "reliable and credible information exist[s] that [Anna] neglected, refused, or was unable for reasons other than poverty to provide necessary care for another child in the home so as to seriously endanger the physical health of that other child"—in the affirmative as a matter of law given the outcomes in Anna's prior CHIPS and TPR cases. The jury was therefore tasked only with answering the second part of the question.

United States and the state of Wisconsin, by statute, by these rules, or by other rules adopted by the supreme court. Evidence which is not relevant is not admissible."). Moreover, not only was this evidence improperly excluded, the circuit court compounded that error by explicitly informing the jury that Anna had no authority at all to make decisions about Francis's care due to the conditions of her probation. As set forth above, that conclusion was erroneous.

¶43 It is also clear that the exclusion of this evidence, particularly coupled with the circuit court's commentary to the jury regarding the reason it concluded the power of attorney was unenforceable, was not harmless error. The jury knew that a purported power of attorney document existed—multiple witnesses testified they had been shown the document and the court itself informed the jury of the court's conclusion that it was legally invalid due to the conditions of Anna's probation—and preventing the jury from hearing the full scope of the circumstances surrounding its creation prevented the jury from learning potentially important information regarding not only Anna's actions but also her state of mind as it related to Francis's care. Accordingly, while it is possible that the jury could have rendered the same verdicts even with this information, the erroneously excluded evidence did not pertain to a peripheral matter and was instead directly relevant to Anna's defense; consequently, the court's refusal to allow her to introduce evidence of the power of attorney was not harmless error. *See* ***State v. Monahan***, 2018 WI 80, ¶35, 383 Wis. 2d 100, 913 N.W.2d 894 (courts consider, inter alia, "the importance of the erroneously … excluded evidence" and "the nature of the defense" in assessing whether an error was harmless).

¶44 Because there is a reasonable probability that the evidentiary rulings regarding the power of attorney and the accompanying instructions to the jury

contributed to the jury's finding of neglect and risk of neglect, Anna is entitled to a new trial wherein she may introduce evidence of the power of attorney and care that Francis received while in Rachel and Beth's custody.

*By the Court.*—Order reversed and cause remanded for further proceedings.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.