COURT OF APPEALS
DECISION
DATED AND FILED

November 19, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP581-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2022CF809

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

JONATHAN JAMES PETERSEN,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Kenosha County: ANTHONY G. MILISAUSKAS, Judge. *Affirmed*.

Before Neubauer, P.J., Gundrum, and Lazar, JJ.

¶1 GUNDRUM, J. Jonathan James Petersen appeals from a judgment of conviction and an order denying his postconviction motion requesting that the circuit court modify the "no social media" condition of his extended supervision so as "to allow social media with agent approval." Because we conclude the court

did not err in ordering the "no social media" condition or in denying Petersen's request to modify it, we affirm.

## *Background*

¶2 Following his pleas to felony charges of stalking, false imprisonment, and two counts of making terrorist threats, all while using a dangerous weapon, the circuit court convicted Petersen of these crimes. A charge of violating a harassment restraining order while using a dangerous weapon was dismissed but read in. The convictions and read-in charge all relate to a June 13, 2022 incident that was the culmination of months of harassment and stalking by Petersen of a young woman-victim who rebuffed his romantic advances. On that date, Petersen entered a gas station where the woman worked and, with a knife and fake but real-looking gun, threatened to kill her, others, and himself. The circuit court sentenced Petersen to five and one-half years of initial confinement and six years of extended supervision.

¶3 In her victim impact statement, which was incorporated into the presentence investigation report (PSI), the young woman-victim explained that prior to the June 13 incident, she had told Petersen

> to please leave me alone. That did nothing other than make it worse. [Petersen] found my social media accounts and said harmful things about me on there. I blocked his account. Every time I blocked his account, he would make a new account and do it again. This continued until I finally just had to delete my social media accounts.

¶4 During the sentencing hearing, the State requested various conditions of extended supervision, among them a ban on Petersen's use of social media. In support of the requested ban, the prosecutor stated, "[G]iven the description of his usage of social media to harass [the young-woman victim] and

2

then how he was creating fake social media [accounts] to continue pursuing her against her wishes[, we believe] that a condition of supervision should also be no usage of social media sites." Petersen's counsel agreed that the State's requested conditions, including the "no social media" condition, were "appropriate," adding that Petersen "shouldn't use social media until he can demonstrate that he can use it responsibly without harassing other people."[1] The circuit court ordered "no social media" as a condition of Petersen's future extended supervision.

¶5 Following sentencing, Petersen filed a postconviction motion sounding a different tune. Referencing his "First Amendment rights," he claimed the circuit court erroneously exercised its discretion in ordering the "no social media" condition because the "total social media ban … is overly broad," arguing that the condition "should be modified to allow social media with agent approval." In the motion, Petersen asserted, inter alia, that he

> has effectively been banished from social media to protect a handful of victims. The only mention of social media in the amended criminal complaint is information from [the young-woman victim] that Mr. Petersen would "often create fake social media accounts with similar usernames, comment on her posts, and then delete the accounts." There was no allegation that Mr. Petersen used social media to plan or execute his criminal activity on June 13, 2022.

---

[1] Due to these comments by Petersen's counsel, the State asserts Petersen should be judicially estopped from challenging the "no social media" condition and/or has forfeited such a challenge. Because we choose to resolve this appeal on the merits and do so in favor of the State, we need not also address whether the State should prevail based upon judicial estoppel or forfeiture. *See Hegwood v. Town of Eagle Zoning Bd. of Appeals*, 2013 WI App 118, ¶1 n.1, 351 Wis. 2d 196, 839 N.W.2d 111 (When the resolution of one issue is dispositive, we need not address other issues raised by the parties.).

¶6      At the postconviction hearing on the motion, the State zealously opposed Petersen's requested modification:

> [Petersen's] Motion only talks about one part of the statement where … [the young woman-victim] had indicated that the Defendant was *creating fake social media accounts*[,] *contacting her*[,] *and then deleting them*, but that was not all that was reported in the case.
>
> And a simple review of the Amended Criminal Complaint details all of the problems she was having going all the way back to January of 2022 when it started through March of 2022 which then prompted her to obtain the *Restraining Order* which even then *didn't stop his contact and stalking of her* which culminated in the [June 13, 2022] hostage situation at the [gas station].
>
> [The young-woman victim] had reported blocking him on social media. When that occurred[,] he started showing up where she worked. And he would also put things on social media *about her*. Had *multiple accounts that he would use to harass her* during the pendency of the stalking she reported.
>
> ….
>
> The Defense argued that in this case there w[ere] the ["]no contacts["] that were Ordered. However, in my experience in 22 years, even if the [c]ourt leaves it up to the Agent whether or not someone can use the Internet or social media, the Department of Corrections has admitted they have no way to monitor it.
>
> So they might approve it, but they are not monitoring it. So how do we know or *how are we able to protect other potential victims who this Defendant feels slighted by* for not pursuing relationships with him ….
>
> ….
>
> [The "no social media" condition] needs to be there because this was one of the factors that led to what occurred at the [gas station] in this case.

(Emphases added.)

¶7 The circuit court denied Petersen's motion to modify the "no social media" condition "based on the facts that the State gave," adding that Petersen "was involved with the victims in social media usage that was disturbing, creating fake accounts[,] using comments[,] and deleting [the accounts]. That was a concern for the [c]ourt at Sentencing." The court also noted that Petersen "is able to refile that Motion … when he is ready to go on [extended s]upervision because that's when it would [a]ffect [him] and the [c]ourt would have more information as to … his activity in the prison system."

¶8 Petersen appeals.

## *Discussion*

¶9 "When reviewing a challenge to conditions of extended supervision, we generally 'review such conditions under the erroneous exercise of discretion standard to determine their validity and reasonableness measured by how well they serve their objectives: rehabilitation and protection of the state and community interest.'" *State v. King*, 2020 WI App 66, ¶25, 394 Wis. 2d 431, 950 N.W.2d 891 (quoting *State v. Stewart*, 2006 WI App 67, ¶11, 291 Wis. 2d 480, 713 N.W.2d 165); *see also State v. Rowan*, 2012 WI 60, ¶10, 341 Wis. 2d 281, 814 N.W.2d 854 ("It is also appropriate for circuit courts to consider an end result of encouraging lawful conduct, and thus increased protection of the public, when determining what individualized [supervision] conditions are appropriate for a particular person."). A defendant seeking modification of his or her supervision conditions "bears the burden of showing cause for the modification." *King*, 394 Wis. 2d 431, ¶24.

¶10 Here, Petersen seeks modification of the "no social media" condition of his extended supervision, challenging the condition's constitutionality under the

First Amendment. "The constitutionality of a condition of probation [or extended supervision[2]] raises a question of law, which this court reviews independently without deference to the decisions of the circuit court …." *State v. Oakley*, 2001 WI 103, ¶8, 245 Wis. 2d 447, 629 N.W.2d 200; *King*, 394 Wis. 2d 431, ¶25.

¶11 Our supreme court has made clear that "a convicted felon does not stand in the same position as someone who has not been convicted of a crime." *Oakley*, 245 Wis. 2d 447, ¶19 (quoting *Edwards v. State*, 74 Wis. 2d 79, 84-85, 246 N.W.2d 109 (1976)). As a result, "[c]onditions of [extended supervision] may impinge upon constitutional rights as long as they [1.] are not overly broad and [2.] are reasonably related to the person's rehabilitation." *Rowan*, 341 Wis. 2d 281, ¶10 (third and fourth alterations in original) (citing *Oakley*, 245 Wis. 2d 447, ¶19). "A condition is reasonably related to the person's rehabilitation 'if it assists the convicted individual in conforming his or her conduct to the law.'" *Rowan*, 341 Wis. 2d 281, ¶10 (quoting *Oakley*, 245 Wis. 2d 447, ¶21). "It is also appropriate for circuit courts to consider an end result of encouraging lawful conduct, and thus increased protection of the public, when determining what individualized probation conditions are appropriate for a particular person." *Rowan*, 341 Wis. 2d 281, ¶10 (citing *Edwards*, 74 Wis. 2d at 83). The two-part *Rowan* standard applies even where an extended supervision condition restricts a fundamental right, such as the right to free speech restricted here. *See Oakley*, 245 Wis. 2d 447, ¶19 n.27 (collecting cases). Based on the foregoing law, we

---

[2] "[A]uthority relating to the propriety of conditions of probation is applicable to conditions of extended supervision." *State v. Koenig*, 2003 WI App 12, ¶7 n.3, 259 Wis. 2d 833, 656 N.W.2d 499; *State v. Rowan*, 2012 WI 60, ¶10, 341 Wis. 2d 281, 814 N.W.2d 854 (analyzing "the condition of extended supervision at issue in [the] case under the … test we have used previously to analyze the constitutionality of probation conditions.").

conclude that the "no social media" condition is constitutional and the circuit court did not erroneously exercise its discretion by imposing it or denying its modification.

¶12 Petersen asserts that the "no social media" condition is overly broad, relying heavily upon the fact that the circuit court also imposed a "no contact" supervision condition prohibiting Petersen from contacting the named victims in this case. He complains that he "has been effectively banished from social media to protect *a handful of victims*." (Emphasis added.) In short, Petersen challenges the "no social media" condition based on his apparent view that protecting the young-woman victim and other June 13, 2022 victims is the only significant interest promoted by the condition.[3] Such a view is far too narrow.

¶13 As indicated, related to the goal of rehabilitation, "judges must also concern themselves with the imperative of protecting society and *potential victims*." **Oakley**, 245 Wis. 2d 447, ¶12 (emphasis added); *see supra* ¶11. Thus, a circuit court ordering conditions of supervision must consider not only the particular victims in the case before it, who were affected by a defendant's past wrongful conduct, but also society as a whole, in order to protect potential future victims. The court's "no social media" condition in this case comports with these considerations.

---

[3] At one point, Petersen writes in passing: "While the conduct involved in this case is threatening in nature, it does not require complete banishment from an important First Amendment space in order to protect *the public* or the victims." (Emphasis added.) Petersen, however, fails to develop any argument as it relates to protecting "the public." He instead focuses his argument on his contention as represented here: "While protection of [*the young woman-victim*] *or other named victims* may be a significant governmental interest, the complete ban on social media is not narrowly tailored to *that* interest." (Emphases added.)

¶14    The "no social media" condition not only helps prevent Petersen from harassing the young-woman victim and other June 13 victims in this case, it also helps prevent him from harassing additional young-women victims, or others, in the future.  In considering whether the "no social media" condition is *overly* broad, it appears to us that the first interest—prohibiting Petersen from harassing the June 13 victims—would be more effectively achieved with the "no social media" condition than with just the "no contact" condition alone, and, significantly, preventing Petersen from harassing other members of the public would not be achieved at all without the "no social media" condition.  As the prosecutor stated at the postconviction motion hearing, without the "no social media" condition, "how are we able to protect other potential victims who [Petersen] feels slighted by for not pursuing relationships with him."

¶15    Petersen asserts that the "no contact" condition is sufficient to protect the young-woman victim and other June 13 victims, but we disagree. After months of harassment by Petersen, the young-woman victim obtained a restraining order against him on April 18, 2022, prohibiting him from contacting her.  Demonstrating his complete lack of respect for a circuit court order directly prohibiting him from contacting her, less than two months later, an undeterred Petersen made contact with her at her workplace and engaged in the alarming actions underlying this case.  Additionally, Petersen harassed the young woman-victim, in part, by saying "harmful things" *about* her, not just *to* her, on social media.  While it appears Petersen said those harmful things about the young-woman victim on her own social media accounts, which would likely constitute "contact" with her in violation of the "no contact" provision if he did *that* to her again in the future, he has demonstrated significant tenacity, creativity and computer savvy, making it more than plausible that he might well choose to harass

her in the future by saying "harmful things" about her on other social media sites. The "no contact" condition would not clearly help protect her from such actions, but the "no social media" condition would. Thus, the latter condition provides the young woman-victim, as well as other June 13 victims, protection that the "no contact" condition alone would not clearly provide.

¶16    The "no social media" condition will also aid Petersen with his rehabilitation[4] by helping him conform his conduct to the law in relation to others. As we have already suggested, the condition also will help prevent Petersen from building a new harassment campaign against *other* potential future victims. We note that the young-woman victim indicated in her victim impact statement that once she deleted her social media accounts, thereby impeding Petersen's harassment attempts through that medium, he started harassing her in person, which "culminated" in him terrorizing her and multiple others with both real and real-looking-but-fake weaponry at the gas station on June 13. The "no social media" condition can assist Petersen with conforming his conduct to the law by preventing him from beginning a stalking or harassment social media campaign against future victims, which Petersen has shown can ramp up into something much more dangerous. The "no social media" condition imposed by the circuit court advances both the extended supervision goals of rehabilitation of Petersen and of "protect[ing] society and potential victims from future wrongdoing" by him. *See **Oakley***, 245 Wis. 2d 447, ¶¶12-13.

¶17    Petersen asserts that "[t]here was no allegation that social media was used to plan or execute [his] criminal activity on June 13, 2022." But, "the law is

---

[4] Petersen acknowledges that "the social media ban may further [his] rehabilitation."

clear that a condition of supervision need not be related to wrongful actions by a defendant in the particular case before the [circuit] court." ***State v. Davis***, 2017 WI App 55, ¶16 n.5, 377 Wis. 2d 678, 901 N.W.2d 488. That said, as the young-woman victim explained in her victim impact statement and the State explained at the postconviction hearing, Petersen's use of social media *was* part and parcel of his campaign of harassing the young-woman victim, which ultimately culminated in the alarming events of June 13. In response to Petersen's harassment of the woman on social media, she blocked him. When she did that, "he started showing up where she worked. And he would also put things on social media[,]" "sa[ying] harmful things" about her there. Every time she blocked his account, "he would make a new account and do it again" until the young woman-victim "just had to delete" her own social media accounts.[5] As the State argued, the "no social media" condition "needs to be there because this was one of the factors that led to what occurred at the [gas station] in this case."

¶18 For the foregoing reasons, we conclude that the "no social media" condition is not overly broad and is reasonably related to Petersen's rehabilitation.[6] We relatedly conclude that the condition is lawful, that Petersen

---

[5] Through his aggressive campaign of social media harassment, it appears *Petersen* infringed upon the *young-woman victim's* use of social media.

[6] In his appellate briefing, Petersen develops a legal challenge only to the circuit court's rejection of his proposed modification of the "no social media" condition, which modification would have allowed him to use social media with the approval of a Department of Corrections (DOC) agent. We emphasize that Petersen did not seek modification of the "no social media" condition to allow him to access certain social media sites that, for example, may aid him in future employment opportunities while also presenting limited risk of harassment to the June 13 victims or other potential victims—e.g., a modification such as "no social media, except X, Y and Z sites accessed for the purpose of …." Nor did he even seek modification to clarify what the court considers as "social media."

(continued)

failed to meet his "burden of showing cause for [his requested] modification," *see King*, 394 Wis. 2d 431, ¶24, and that the circuit court did not err in denying Petersen's request.

 *By the Court.*—Judgment and order affirmed.

 Recommended for publication in the official reports.

---

 Notably, even if the circuit court had granted Petersen his modification request, a DOC agent also could have flatly prohibited him from accessing any social media sites for the entirety of his extended supervision, just as the court's order did. Or, an agent alternatively could have permitted him unlimited access to and use of any social media sites, including those used by the victims (as long as he did not contact any victims himself through those sites, due to the existing "No Contact" order), which unlimited access would be inconsistent with the court's intent with regard to Petersen's time on extended supervision. The question Petersen presented to the circuit court was simply about "who will make the decision"—the court itself or an agent over whom the court could not exercise control. It may well be that if Petersen had presented the court with a persuasive request for a less unbridled, more specific modification, the court might have provided him with satisfaction. Again, that question is not before us, however, because Petersen only requested modification to allow his use of social media with an agent's approval.

11